IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 108,547
109,059

STEVEN G. CRESTO and TERESE JONES,
*Appellees/Cross-appellants*,

v.

MARY K. KOEHLER CRESTO,
Individually and as Trustee of the
FRANCIS E. CRESTO TRUST,
*Appellant/Cross-appellee*.


In the Matter of the Estate of
FRANCIS E. CRESTO, Deceased.


SYLLABUS BY THE COURT


1.

When a will or other testamentary document is contested, the proponent has the initial burden of proving a prima facie case for its validity, which requires proof that the testator or testatrix had testamentary capacity and that the execution of the will or other testamentary document complied with the requisite statutory formalities. Once the prima facie case for validity has been made by the proponent of the document, the burden shifts to the opponent of the document to overcome the presumption of validity by clear, satisfactory, and convincing evidence.


2.

One manner in which an opponent of a testamentary document can overcome the presumption of validity is to show that it was the product of undue influence, which has been defined as such coercion, compulsion, or constraint that the document maker's free

1

agency is destroyed, and because the maker's power of resistance has been overcome, the maker is obliged to adopt the will of another rather than exercise the maker's own.

3.

Because undue influence by a person in a confidential relationship with the maker of a testamentary document is often not amenable to direct proof, courts utilize the suspicious circumstances doctrine. Under the suspicious circumstances doctrine, a person contesting a testamentary document without direct evidence that it was the product of undue influence can nevertheless establish a presumption of undue influence by showing that (1) the person who is alleged to have exerted undue influence was in a confidential and fiduciary relationship with the person executing the testamentary document, and (2) there were suspicious circumstances surrounding the making of the testamentary document.

4.

The question of whether suspicious circumstances exist to create a presumption of undue influence in the making of a testamentary document is a question of fact to be determined on a case-by-case basis in light of the factual background presented. Similarly, the determination of whether a fiduciary or confidential relationship exists between the maker of a testamentary document and the person alleged to have exerted undue influence over the maker is a question of fact.

5.

When considering the sufficiency of the evidence to support a trial court's findings of fact, an appellate court does not reweigh the evidence or pass on the credibility of witnesses.

6.

If an opponent to a testamentary document establishes the existence of suspicious circumstances, a presumption of undue influence is created which shifts the burden to the proponent of the document to rebut the presumption of undue influence.

7.

The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.

8.

The awarding of attorney fees to a party under K.S.A. 58a-1004 is discretionary. Appellate review of a district court's decision regarding attorney fees under K.S.A. 58a-1004 is subject to an abuse of discretion standard, which includes an assessment of whether no reasonable person would adopt the position taken by the district court.

Review of the judgment of the Court of Appeals in an unpublished opinion filed October 11, 2013. Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed October 9, 2015. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Matthew Stromberg*, of the same firm, and *Jay Fowler*, of the same firm, of Wichita, were with him on the briefs for appellant/cross-appellee.

*Michael R. Ong*, of Ong Law Firm, P.A., of Leawood, argued the cause and was on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

JOHNSON, J.: Steven Cresto (Steven) and Terese Jones (Terese), collectively referred to herein as "children," were the natural children of Francis E. Cresto, deceased (Decedent). The children challenged Decedent's 2008 last will and testament and inter vivos trust which changed his prior estate plan to leave full ownership of all of his property to his third wife and the children's second stepmother, Mary K. Koehler Cresto (Kathleen), and her children, thereby effectively disinheriting the children. The district court ruled that Kathleen, through the actions of her daughter's paramour, had exerted undue influence over Decedent's preparation and execution of the 2008 testamentary documents. Consequently, the district court reinstated Decedent's 2004 estate plan, but the court refused to award the children attorney fees from Decedent's estate.

Kathleen appealed the undue influence ruling, and the children cross-appealed the denial of attorney fees. The Court of Appeals reversed the district court, finding insufficient evidence to support the lower court's finding of suspicious circumstances with respect to the 2008 documents. The children petitioned for our review, claiming that the panel exceeded its standard of review by making its own findings of fact and reweighing the evidence and asking this court to consider the attorney fees issue. We agree with the children's argument that the panel impermissibly reassessed witness credibility and reweighed the evidence on the undue influence issue, but we decline to find that the district court abused its discretion in refusing to award attorney fees. Accordingly, the Court of Appeals is reversed and the district court is affirmed.

4

The Court of Appeals set forth a detailed recitation of the facts in this case, but we will not repeat all of those facts here. Our goal is to provide an overview that will give our opinion proper context, while adding additional facts in the analysis as needed.

*Family Relationships*

Decedent, an IBM executive, first married in 1952. That union produced three children: Steven, Terese and Jeanne. Those children were still young when Decedent and his first wife divorced. Decedent later married Janet, who had two children, Kelly and Lauri. In 1971, Decedent and Janet relocated to Connecticut where they resided until Decedent's retirement from IBM in 1985. After retiring, Decedent and Janet moved to New Mexico where they lived until Janet's death in 1992. Decedent then returned to the Kansas City area in order to be close to his children and his brother, Jack.

In 2003, Decedent married Kathleen, whom he had met at church. Kathleen had been single since her 1974 divorce, and she had seven adult children. One of Kathleen's children, Rita, was in a romantic relationship with Patricia Hackett, an Indiana attorney with extensive experience in estate planning. Decedent met Hackett at his wedding to Kathleen, and Hackett cultivated a close relationship with Decedent based on their common interests in theology, history, and politics.

Witnesses testified that it appeared that Decedent and Kathleen had a loving marriage and that Decedent had developed a relationship with Kathleen's children and grandchildren. Steven and Terese continued to maintain their relationship with their father, even after his marriage to Kathleen.

*Decedent's 1997 Estate Plans*

In November 1997, Decedent established a revocable trust titled the Francis E. Cresto Trust (Trust), which was prepared by his attorney, Edward J. White. Pursuant to the Trust terms, Decedent's three children and two stepchildren were to receive the balance of the Trust after his death. The Trust included Decedent's one-half interest in Florida real estate that he inherited from his parents and co-owned with his brother, Jack. The Trust referenced a personal property list maintained by Decedent providing for the specific distribution of those listed items. The list included several valuable paintings and clocks that had been originally purchased by Decedent's parents and that were considered to be "family heirlooms" by Steven and Terese. Consistent with Decedent's characteristics, the list contained meticulous descriptions of the personal property with specific instructions as to whom and how the property should be distributed.

*2000 Amendments to Estate Plans*

In May 2000, Decedent executed a First Amendment to the Trust, which was once again prepared by White. That amendment updated the Trust beneficiaries in light of his stepdaughter Kelly's death and added a specific bequest of $100,000 to the hospital where Janet had received cancer treatment. Decedent also updated his personal property list at that time.

*2003 Premarital Agreement and Amendments to Estate Plan*

Prior to Decedent's marriage to Kathleen, White prepared a prenuptial agreement wherein Kathleen was granted a life estate in Decedent's residence. The agreement also provided that if Kathleen survived Decedent, she would receive a beneficial interest in the Trust income during her lifetime but that she could also receive distributions from the

6

Trust principal when needed for her health, support, maintenance, and education, as determined by the trustee. The agreement also addressed Decedent's and Kathleen's permissive use of each other's personal property upon surviving the other but expressly provided "'the surviving spouse shall not be allowed to dispose of the deceased spouse's tangible personal property except and other than by gifts to the deceased spouse's descendants.'" At the time the premarital agreement was executed, Decedent's estate was valued at approximately $1,058,000, while Kathleen's estate was valued at approximately $142,000.

Shortly after his May 2003 wedding, Decedent executed a Second Amendment to the Trust Agreement (Second Amendment) incorporating the premarital agreement provisions, and retaining Steven, Terese, Jeanne, and Lauri as the Trust's ultimate beneficiaries. Once again, White prepared the estate documents. The Second Amendment allowed Kathleen the option of choosing a different successor trustee if she survived Decedent, subject to unanimous consent by the Trust beneficiaries. At this time, Decedent also executed a general durable power of attorney designating Kathleen as his attorney-in-fact, together with White.

*2004 Amendments to Estate Plans*

In May 2004, Decedent spoke to Hackett, who practiced law in Indiana, about making some changes to his estate plans. Contemporaneously written notes from Hackett's May 2004 conversation with her associate stated that Decedent wanted to change his plans because "[h]is kids are less stable than hers[,] [w]ants Kathleen to be cared for for life and avoid fight[s] with kids.'"

Hackett agreed to represent Decedent by drafting the necessary estate planning documents but told Decedent that he would need to retain a Kansas attorney to review the

7

documents and ensure they were executed properly. According to Hackett, although Decedent still held a high regard for White, he wanted to use someone else because White was nearing retirement. Using an attorney referral service, Hackett contacted retired federal circuit Court of Appeals judge James K. Logan (Logan), who was considered a highly qualified and experienced estate planning attorney, to serve as local counsel.

On September 22, 2004, Decedent met with Logan and executed his First Codicil to the Last Will and Testament of Francis E. Cresto ("the 2004 Will") and the Third Amendment to the Trust Agreement of Francis E. Cresto Dated the 3rd Day of November 1997 ("the 2004 Trust"). The 2004 Will continued to allow Kathleen the right to use all of Decedent's tangible property during her lifetime and added an in terrorem, *i.e.*, no contest, clause intended to protect Kathleen's life estate interest against any challenge from his children and stepdaughter. The 2004 Trust amended the bequest to the hospital to be an amount that would not exceed 10 percent of the estate. The 2004 Trust continued Kathleen's life interest in Decedent's residence but also allowed her to sell the residence if she wished to purchase a replacement residence. Steven and Terese do not challenge the efficacy of the 2004 Will or Trust.

*2008 Amendments to Estate Plans*

On December 29, 2007, Decedent again contacted Hackett and allegedly informed her that he now wanted to remove his children and stepdaughter as beneficiaries from his estate plans. Decedent explained that his children did not need the resources and that his relationship had changed with his stepdaughter. Hackett started to work on the changes but did not consider Decedent to be in any rush at that time.

In April 2008, Decedent was diagnosed with prostate cancer. After the diagnosis, he contacted Hackett and said he wanted to finish the changes to his estate plans before he began treatment. Consequently, on April 25, 2008, Hackett sent Logan a letter enclosing drafts of Decedent's new will, trust, and general durable power of attorney for his review. The letter to Logan stated: "Mr. Cresto's requested changes to his Will and Trust are designed to benefit his spouse, Mary Kathleen Koehler Cresto," and "Mr. Cresto's contingent dispositive provisions, should Kathleen predecease him, also have been changed replacing Mr. Cresto's children with specific distributions to Kathleen's children and the residuary passing to several charities." The letter requested Logan to review the documents to ensure they complied with Kansas law and to "meet with Mr. Cresto to facilitate a careful review and execution of these documents to assure that they comport with his wishes and the formalities required by Kansas law." Hackett did not disclose to Logan that she had a romantic relationship with Kathleen's daughter, Rita, who was a named beneficiary under the new estate plan.

The 2008 Will bequeathed all of Decedent's tangible personal property outright to Kathleen, making no bequests to Decedent's children or stepdaughter. Moreover, the 2008 Will provided that if Kathleen did not survive Decedent, all of his personal property would pass to Kathleen's children. The 2008 Trust provided that the entirety of the Trust assets were to be distributed free and outright to Kathleen, assuming she survived Decedent. In the event that Kathleen did not survive Decedent, a specific bequest of $25,000 was to be made outright and free of the Trust to each of Kathleen's seven children, with the remainder of the estate distributed among several charities.

On May 2, 2008, Logan met with Decedent and Kathleen to execute the estate planning documents. Logan spent approximately 30 minutes discussing with Decedent the estate plan changes, his assets, and his marital history, albeit Kathleen was present during Logan's consultation with Decedent. Logan would later state that he believed that

9

Decedent was competent and in charge but questioned "him about why he cut out his children, why he gave it all to his wife. He'd been married now four years or so at that time, so not wildly surprising, but I wanted to know." Decedent told Logan that his children were successful business people and did not need the money; his diagnosis of prostate cancer made him realize he was mortal; he wanted to take care of Kathleen; and he didn't want his children to hassle Kathleen once he had died. Decedent also said he wanted to retain the in terrorem clause to let his children know his wishes, although Logan informed Decedent that the in terrorem clause would no longer serve as a deterrent because his children were receiving nothing under the 2008 Will and Trust. Logan did not discuss specific items of personal property with Decedent, but Decedent told Logan that Kathleen could give his children whatever she wanted.

Logan asserted that, based on his discussions with Decedent, he had concluded there was "no doubt that [Decedent] was competent" and there was "no doubt that he was in charge." Although Kathleen was present during the discussion, Logan reported that she said very little and he saw no indication that Kathleen was attempting to improperly influence Decedent.

After reviewing the 2008 estate planning documents with Logan, Decedent executed the 2008 Will and Trust in accordance with the testamentary and legal formalities. The parties stipulated that Decedent possessed the rights of majority and was of sound mind at the time he executed the 2008 estate planning documents.

*Decedent's Death and District Court Proceedings*

Decedent was diagnosed with dementia in late 2009 and suffered a catastrophic stroke on March 26, 2010, which caused his death on March 31, 2010. Decedent never

informed Steven or Terese that he had completely disinherited them from his estate plan; instead Terese learned this news from Logan after Decedent's death.

Probate proceedings were instituted in June 2010 in Johnson County District Court. In March 2011, Steven and Terese filed a petition for declaratory judgment, alleging that Decedent's 2008 Will and Trust should be declared invalid for statutory "undue influence" under K.S.A. 59-605 or K.S.A. 58a-406(b) and common-law undue influence exerted by Kathleen. Decedent's other daughter, Jeanne, who had been estranged from her father for some time prior to his death, and his stepdaughter, Lauri, did not join in the lawsuit. The probate and civil cases were consolidated.

A bench trial was conducted wherein both Steven and Terese testified that up until the time of his death, they continued to maintain a good relationship with their father, who continued to indicate that they were beneficiaries of his estate. Witnesses for Kathleen testified about the close relationship she and her children had with Decedent.

At the close of the evidence, the district court granted judgment to Kathleen on the statutory claim of undue influence, finding that Hackett's relationship with Rita was not a statutorily prohibited relationship for a will scrivener. However, as to the common-law claim of undue influence, the district court first found that Kathleen and Hackett were in confidential relationships with Decedent. The district court further found the existence of suspicious circumstances to support a presumption of undue influence. As such, the district court determined the burden shifted to Kathleen to rebut the presumption of undue influence. The district court then instructed the parties to proceed with closing arguments.

The next morning, the district court announced its ruling from the bench. With regard to its first finding, the district court determined that "[a]lthough the named

11

defendant in this case is Kathleen, the agency and actions of Patricia Hackett are well within the issues framed by the pretrial order." Accordingly, the district court concluded that Kathleen "caused to be drafted or induced the 2008 changes to the Francis Cresto estate . . . through the agency of Patricia Hackett."

The district court also determined that Decedent did not receive any independent legal advice from Hackett because of her emotional involvement and romantic relationship with Kathleen's daughter. In addition, the district court made several detailed factual findings in determining that Logan did not provide Decedent with independent legal advice. Of note, the district court found that Logan's testimony regarding the sufficiency of his discussions to ascertain Decedent's intent to disinherit his children was not credible. The district court reasoned that Logan's billing records established insufficient time to discuss the matter at any length; that Kathleen, who was present during the discussions, did not corroborate Logan's testimony; and that Logan's statements to Steven and Terese that the trust became irrevocable after Decedent's death, when in effect it terminated, evidenced an unfamiliarity with the estate plan documents that contradicted the allegation that Logan had thoroughly explained them to Decedent.

The district court also expounded upon its factual findings by stating numerous suspicious circumstances supporting the presumption of undue influence. The district court then found that Kathleen had failed to rebut the presumption of undue influence by proving, with clear and convincing evidence, "that there was no undue influence, or if there was undue influence, it did not taint or overcome the free will and intent of Francis E. Cresto as testator and settlor of the 2008 estate planning documents."

Consequently, the district court entered a written order of judgment declaring that the 2008 Will and Trust were null and void based on the common-law claim of undue influence and that the 2004 Trust was "the last valid and controlling version of the

12

Francis E. Cresto Trust." Nevertheless, the district court denied the children's motion for attorney fees and costs, finding that such an award would "run contrary to the purposes and intent of the settlor and diminish the assets that he had determined unequivocally to be for the benefit of Kathleen during her lifetime."

*Court of Appeals' Proceedings*

Kathleen appealed, raising multiple issues with regard to the district court's determination of undue influence. Steven and Terese cross-appealed the district court's denial of their motion for attorney fees.

The Court of Appeals framed the decisive issue on appeal as "whether the facts demonstrate a prima facie case of undue influence to negate the properly executed documents such that the burden shifted to Kathleen to demonstrate the lack of undue influence." *Cresto v. Cresto*, No 108,547, 2013 WL 5610245, at *8 (Kan. App. 2013) (unpublished opinion). Utilizing the two-prong test for undue influence set forth in *In re Estate of Bennett*, 19 Kan. App. 2d 154, 165-74, 865 P.2d 1062 (1993), the Court of Appeals first held: "There is no question that the first prong was met in this case. Kathleen does not raise any arguments under the first prong, and there is substantial evidence to support a confidential or fiduciary relationship. Kathleen and Hackett were in a position of trust and confidence with [Decedent] and had the opportunity to exercise influence over him." 2013 WL 5610245, at *12.

With regard to the second prong, the Court of Appeals acknowledged that the existence of suspicious circumstances was a finding of fact and that it was "not to substitute its view of the facts for that of the factfinder unless the trial court's findings are 'clearly erroneous' and unsupported by substantial evidence." 2013 WL 5610245, at *14. Nevertheless, the Court of Appeals proceeded to make its own determination as to

13

Logan's credibility and found that his testimony established that Decedent was properly counseled on the terms of his estate plans before they were executed in accordance with law. 2013 WL 5610245, at *14-15. Therefore the Court of Appeals concluded that there was "insufficient evidence of suspicious circumstances to shift the burden to Kathleen" and reversed the district court's judgment. 2013 WL 5610245, at *15.

COMMON LAW UNDUE INFLUENCE CHALLENGE TO TESTAMENTARY DOCUMENTS

The district court granted Kathleen's motion for directed verdict on the plaintiffs' statutory claim of undue influence pursuant to K.S.A. 58a-406(b). That ruling was not appealed. The claim of undue influence before us emanates from the common law, the determination of which entails multiple steps and a shifting of burdens.

When a will is contested, the proponent has the initial burden of proving a prima facie case for its validity, which requires proving that the testator or testatrix had testamentary capacity and that the execution of the will complied with the requisite statutory formalities. See K.S.A. 59-606 (statutory formalities); *In re Estate of Perkins*, 210 Kan. 619, 624, 504 P.2d 564 (1972) (defining prima facie case). It is well-established in this state that "[w]hen an instrument is presented in the form of a will which has been duly executed and attested according to the statute of wills the law presumes it to be valid." *Ginter v. Ginter*, 79 Kan. 721, 738, 101 P. 634 (1909). The contents of the proffered will need not please the court, the testator's relatives, or anyone else for that matter, so long as the statutory requirements are followed. *In re Estate of Millar*, 185 Kan. 510, 520, 345 P.2d 1033 (1959).

Here, the parties stipulated that Decedent had testamentary capacity at the time he executed his 2008 estate planning documents and that the documents were properly executed in conformance with the law. In other words, the parties stipulated that Kathleen

14

had met her initial burden to establish a prima facie case for validity. Consequently, the burden shifted to the children to overcome the presumption of validity by clear, satisfactory, and convincing evidence. See *In re Estate of Wallace*, 158 Kan. 633, 637, 149 P.2d 595 (1944) (when prima facie showing made, burden shifts to contestant to overcome showing). In assessing whether the contestant has sustained that burden, the trier of fact attaches great significance to the testator's intention, as the right to make a will includes the right to make it according to the testator's own desires. See *Ginter*, 79 Kan. at 750.

The contestants in this case sought to overcome the presumption of validity by proving that Decedent's 2008 testamentary documents did not reflect his own desires because he was unduly influenced to favor Kathleen and her family over his own children. This court has defined undue influence as "'such coercion, compulsion or constraint that the testator's free agency is destroyed, and by overcoming his power of resistance, the testator is obliged to adopt the will of another rather than exercise his own.'" *In re Estate of Kern*, 239 Kan. 8, 16, 716 P.2d 528 (1986) (quoting *In re Estate of Ziegelmeier*, 224 Kan. 617, Syl. ¶ 2, 585 P.2d 974 [1978]). In other words, the testator becomes "the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control." *Ginter*, 79 Kan. at 726.

On the other hand, not all influence is improper. For example, influence obtained by kindness and affection will not be regarded as undue. *Ziegelmeier*, 224 Kan. at 622. For that reason, the *presumption* of undue influence does not ordinarily apply to spouses. See *In re Estate of Robinson*, 231 Kan. 300, 308, 644 P.2d 420 (1982) (citing Atkinson, Law of Wills § 101, p. 550 [2nd ed. 1953]); see also *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 792, 618 N.E.2d 1231 (1993) ("The law does not and should not presume a

15

spouse to be guilty of undue influence simply by reason of the marital relationship alone [citation omitted] or because the spouse has been able throughout the marriage to have considerable influence on her spouse."); *In re Karmey Estate*, 468 Mich. 68, 75 & n.4, 658 N.W.2d 796 (2003) ("[N]o presumption of undue influence arises by the fact of marriage. We do not exclude the possibility that . . . a person might exercise undue influence over a weakened or vulnerable spouse.").

Moreover, human desire, motive, and an opportunity to exercise influence will not, standing alone, sanction the inference that undue influence was, in fact, exercised. *In re Estate of Farr*, 274 Kan. 51, 70, 49 P.3d 415 (2002). Instead, "'there must be evidence that [the person accused of undue influence] did exert it and did so control the actions of the testator that the instrument is not really the will of the testator.'" *In re Estate of Brodbeck*, 22 Kan. App. 2d 229, 233, 915 P.2d 145, *rev. denied* 260 Kan. 993 (1996) (quoting *In re Wilson's Estate*, 399 P.2d 1008, 1009-10 [Wyo. 1965]). Further, in order to establish undue influence, a party must show both the compulsion and a direct relationship between the compulsion and testamentary act. *In re Estate of Haneberg*, 270 Kan. 365, 375, 14 P.3d 1088 (2000). "Undue influence, in order to vitiate the will of a decedent, must directly affect the testamentary act itself." *Bennett*, 19 Kan. App. 2d at 163.

But the very nature of a person exerting undue influence in a confidential relationship makes proving that situation with direct evidence a rarity; it is more commonly proved by circumstantial evidence. *Brennan v. Dennis*, 143 Kan. 919, 954, 57 P.2d 431 (1936); *Ginter*, 79 Kan. at 741 ("'[t]he evidence of undue influence will generally be mainly circumstantial. It is not usually exercised openly, in the presence of others, so that it may be directly proved.'") (quoting *Nelson's Will*, 39 Minn. 204, 206, 39 N.W. 143 [1888]; see also *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003) ("[U]ndue influence may be and usually is proven by circumstantial evidence."); *Blumer*

16

*v. Manes*, 234 S.W.3d 591, 594 (Mo. App. 2007) (case-by-case analysis required in undue influence cases because they are often proved by circumstantial evidence); *Knowlton v. Schultz*, 179 Ohio App. 3d 497, 508, 902 N.E.2d 548 (2008) (undue influence usually proved by circumstantial evidence); *In re Estate of Johnson*, 340 S.W.3d 769, 777 (Tex. App. 2011) (exertion of undue influence is subtle and usually involves extended course of dealings and circumstances; usually established by circumstantial evidence).

That necessity of establishing undue influence through circumstantial evidence gave rise to the "suspicious circumstances doctrine" in a common-law claim of undue influence. See Feeney and Carmichael, *Will Contests in Kansas*, 64 J.K.B.A. 22, 27 (September 1995); see also *In re Estate of Maddox*, 60 S.W.3d 84, 88 (Tenn. App. 2001) (recognizing that in most cases, proving undue influence must be done circumstantially through the existence of suspicious circumstances). Over a century ago in this state, *Sellards v. Kirby*, 82 Kan. 291, 295-96, 108 P. 73 (1910), discussed the role of "suspicious circumstances" in creating a presumption of undue influence, to-wit:

> "Perhaps an unnecessary difficulty is created by an effort to say at just what point the union of a number of suspicious circumstances, no one of which is enough in itself to defeat probate, shall be deemed to give rise to an actual presumption that a will was the result of undue influence. The real question in each case is whether all the circumstances so far as shown are such as to lead the court to believe that in fact the will does not actually express the voluntary purpose of the testator."

Later, *In re Estate of Brown*, 230 Kan. 726, 732, 640 P.2d 1250 (1982), further clarified the doctrine of suspicious circumstances, declaring that

> "'a presumption of undue influence is not raised and the burden of proof is not shifted by the mere fact that a beneficiary occupies, with respect to the testator, a confidential or

17

fiduciary relation . . . .' Such a presumption is raised and the burden of proof shifted, however, 'when, in addition to the confidential relation, there exist suspicious circumstances . . . .' 94 C.J.S., Wills § 239, pp. 1091-93."

Therefore, a person contesting a testamentary document without direct evidence that it was the product of undue influence can nevertheless establish a presumption of undue influence by showing that (1) "the person who is alleged to have exerted undue influence was in a confidential and fiduciary relationship with the [person executing the testamentary document]"; and (2) "there were 'suspicious circumstances' surrounding the making of the [testamentary document]." *Farr*, 274 Kan. at 70-71.

As noted above, after the proponent has proffered a prima facie case for validity, the burden has shifted to the contestant to show the requisite relationship and suspicious circumstances to create the presumption of undue influence. But then, upon the successful creation of the presumption of undue influence, the burden shifts back to the proponent of the testamentary document to rebut the presumption. See *Farr*, 274 Kan. at 71; *Haneberg*, 270 Kan. at 375; *Brown*, 230 Kan. at 732.

The district court held that the children had shown suspicious circumstances in the making of Decedent's 2008 changes to his will and inter vivos trust and that Kathleen had not successfully rebutted the resulting presumption of undue influence. The Court of Appeals did not advance to the last step because it found "insufficient evidence of suspicious circumstances to shift the burden to Kathleen." *Cresto*, 2013 WL 5610245, at *15. Accordingly, we begin with a review of the suspicious circumstances.

EVIDENCE OF SUSPICIOUS CIRCUMSTANCES

The Court of Appeals correctly stated that the issue of undue influence turned on the evidentiary support for the district court's findings. "'The question of whether

18

suspicious circumstances exist is a question of fact to be determined on a case-by-case basis in light of the factual background presented.'" *Haneberg*, 270 Kan. at 376 (quoting *Bennett*, 19 Kan. App. 2d at 170). Similarly, the determination of whether a fiduciary or confidential relationship exists in order to support a finding of undue influence is a question of fact. *Farr*, 274 Kan. at 72.

*Standard of Review*

A district court's findings of fact are reviewed under a substantial competent evidence standard. *City of Wichita v. Denton*, 296 Kan. 244, 255, 294 P.3d 207 (2013). Substantial evidence "is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Farr*, 274 Kan. at 58. Substantial evidence is also "'such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.'" *In re Estate of Reynolds*, 266 Kan. 449, 461, 970 P.2d 537 (1998) (quoting *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377, 855 P.2d 929 [1993]). When considering the sufficiency of the evidence to support a trial court's findings of fact, this court does not reweigh the evidence or pass on the credibility of witnesses. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

*Analysis*

Unlike some areas of the law, our courts have declined to set forth a laundry list of factors to aid in the determination of the existence of suspicious circumstances. Rather, that determination must be made on a case-by-case basis because "[w]hat may appear as 'suspicious' under one set of facts may be considered normal under another." *Bennett*, 19 Kan. App. 2d at 170.

19

The district court made numerous findings of suspicious circumstances that were particular to the totality of circumstances in this case. Kathleen does not specifically challenge the evidentiary support for the district court's findings, but rather she argues that each circumstance was simply not suspicious or that the circumstance had no influencing effect on Decedent. We take the liberty of summarizing and grouping the district court's findings for discussion, together with Kathleen's arguments in opposition to the findings.

### Complete Disinheritance of Children

The district court found that Decedent's complete disinheritance of his children was a suspicious circumstance for a number of reasons. The court opined that cutting out his children was contrary to the Decedent's undisputed character of being a loyal, devoted, family man. The disinheritance also contradicted Decedent's repeated assurances to the children that they would receive family heirlooms and the ancestral Florida real estate. Further, the court found it suspicious that the relationship between Decedent and his children had not changed in any manner that would cause the disinheritance and that neither child was aware of the changed estate plan. Moreover, the district court noted that completely disinheriting the children in favor of Kathleen's children was not necessary to fulfill Decedent's expressed intent of insuring that Kathleen was taken care of for the rest of her life.

Kathleen suggests that there is nothing unusual about a husband leaving his property to his wife outright to make certain that his children by a prior marriage do not cause the surviving wife any trouble. Her focus on the impracticalities of a life estate in tangible personal property, such as a television or computer, seems contrived, given that one would expect a large portion of a million dollar estate to consist of fungible assets that are very amenable to a life estate, *e.g.*, stocks, bonds, or cash accounts. Nevertheless,

the point is well taken that an estate plan that gives full ownership of everything the Decedent owns to a surviving spouse is not per se suspicious. It is the context that creates the suspicion.

There was substantial competence evidence presented that Decedent historically treated his stepchildren the same as his natural children, notwithstanding that stepchildren are not the natural objects of a Decedent's bounty. See K.S.A. 59-501(a) (defining "children" as used in intestate succession statutes as biological children, adopted children, or children determined under Kansas Parentage Act, but not unadopted stepchildren). If Decedent had died intestate, leaving a surviving spouse and natural children, the spouse would have received approximately half of the estate and the natural children would have shared the other half. See K.S.A. 59-505 and 59-506. But the original inter vivos revocable trust prepared by White left the balance of the estate to all of the children of the blended families, *i.e.*, Decedent's three children and two stepchildren.

Likewise, Decedent did not previously replace his "old family" with his "new family," as he did in 2008. In arguing logical reasons for Decedent to disinherit his natural children, Kathleen points out that Decedent's first marriage to the children's mother ended in divorce when Steven and Terese were ages 7 and 5, respectively. Then, in 1971, Decedent remarried and moved to Connecticut to live with his new wife and family, while his natural children remained in Kansas City with their mother. The apparent implication of pointing out those facts is that Decedent no longer had a close enough familial bond with the children for him to include them in his estate plan. But in 1997—over a quarter century after divorcing their mother—Decedent made the children an integral part of his estate plan, alongside the stepdaughter with whom he had most recently resided. The new family was *added* to the old family.

21

When Decedent amended his estate plan in 2000, following the death of his stepdaughter, Kelly, he continued to include both his children and his remaining stepchild as beneficiaries. Even after Decedent married Kathleen in May 2003, he amended his trust two times and kept his children and stepdaughter as principal beneficiaries, albeit the amendments made provisions to assure that the entire principal of the trust could be available to care for Kathleen. Therefore, the abrupt complete disinheritance of the children in 2008 was an unprecedented action that begs for a better explanation than that the Decedent divorced the children's mother approximately 40 years earlier. In other words, under the set of facts presented in this case, the children's disinheritance in favor of Decedent's newest stepchildren presents a suspicious circumstance.

That suspicion is further corroborated by the fact that Decedent had taken pains to make provision for his natural children to receive certain family heirlooms and the real estate in Florida that was co-owned with his brother, Jack. As the district court found, abandoning the effort to keep family heirlooms in the family and imposing on his brother an unwanted nonfamily co-owner of the family real estate was inconsistent with Decedent's character. In short, the district court's findings had evidentiary support.

*Hackett as Estate Planning Attorney*

The district court addressed Hackett's role in the disinheriting of the children, viewing that circumstance from different angles. First, the court noted that the undue influence which will invalidate a testamentary instrument can be exerted by a third person, as well as the beneficiary.

> "There is no restriction as to those who may be shown to have exercised undue influence on a testator. . . . The undue influence in the execution of a will which will invalidate it may be that of a third person, as well as of a beneficiary. . . . [T]he absence of volition on

22

the part of the testator means absence without reference to whether or not the party who influenced him benefits by the will or is the agent of a beneficiary. . . . A will may be invalidated because of undue influence of which the beneficiary was entirely ignorant.' 79 Am. Jur. 2d, Wills, § 394, p. 553." *Harper v. Harper*, 274 Ga. 542, 543, 554 S.E.2d 454 (2001).

Kathleen contends that the district judge should not have considered any influence exerted by Hackett because plaintiffs did not plead that cause of action. But we view the petition in this case as being broad enough to encompass Hackett's participation in the alleged undue influence, and the district court made the specific finding that "[a]lthough the named defendant in this case is Kathleen, the agency and actions of Patricia Hackett are well within the issues framed by the pretrial order." We defer to the district court's assessment of the breadth of its own pretrial order.

The district court opined that Hackett was too emotionally involved with Decedent and Kathleen—akin to being family—that she could not have given truly independent counsel on Decedent's estate planning. As evidence supporting that conclusion, the court noted that Hackett "was emotionally moved in her testimony." Of course, a district court's ability to observe witnesses and, in this case to assess detachment, objectivity, and professionalism, is one of the reasons that appellate courts defer to the trial court's factual findings and witness credibility assessments. See *Eaton v. Johnston*, 235 Kan. 323, 324, 681 P.2d 606 (1984) (because of trial court's advantageous position, appellate court does not retry disputed factual issues nor pass on credibility of witnesses and weight to be given each piece of testimony).

With regard to the family-like relationship, the district court pointed out that although Hackett internally billed $7,986 for the 2004 estate plan amendments, she only charged the Decedent $2,000. Then, in 2008, she charged $1,500, writing off a 75 percent

discount. Such deep discounting of fees is, at least, an unusual circumstance for an arm's-length, independent counsel arrangement.

The district court made special note of Hackett's relationship with Kathleen's daughter, Rita, who Hackett later married. Not only was Rita a potential beneficiary of the assets her mother would inherit from Decedent, but she was a *named beneficiary* in the 2008 documents. In other words, Hackett drafted testamentary documents for a nonfamily client that made specific provisions for her significant other to inherit under those documents under certain circumstances. Accordingly, there was substantial competent evidence to support the district court's finding that the estate plan drafted by Hackett provided "some indirect benefit to [Hackett's] own spouse and herself."

Kathleen argues that Hackett expressly stated in 2008 that she was representing the Decedent and not representing Kathleen. But the district court was not persuaded by that self-serving statement, especially in light of Hackett's failure to advise Logan of her potential conflict of interest. As the district court found, Logan thought Hackett was simply the Decedent's long-time estate planning attorney for whom Logan was rendering a professional courtesy by conducting the formality of execution. If Hackett truly expected Logan to independently ascertain whether the testamentary documents she had drafted were a product of the Decedent's free will, it is suspicious that she failed to disclose that she had a close personal relationship with the family that would be taking the children's share of the estate under the new estate plan. Perhaps if Logan had known of the unusual circumstance, he would have discussed the new estate plan with the Decedent in private, without the presence of the person for whom undue influence would most likely be alleged under the new plan.

Certainly, Logan acknowledged that knowing about Hackett's relationship with Kathleen's family might have changed the manner in which he published Decedent's

declaration of free will and voluntariness. Logan's acknowledgment supports the notion that Hackett withheld information that Logan should have possessed. In short, there was evidentiary support for the district court's finding that Logan was never advised that there would be a need for thorough, "independent legal advice," rather than just providing assistance in formalizing the execution of the documents. The independent nature of Logan's counsel will be discussed more fully below with respect to whether Kathleen rebutted the presumption of undue influence created by the suspicious circumstances.

Before moving on to the other circumstances relied upon by the district court, we pause to note one circumstance which most likely would have made the children's claim of undue influence too high a mountain to climb. Both before and after he married Kathleen, Decedent relied on the advice of his attorney, White, who constructed the foundation for Decedent's estate plan. Indeed, the level of confidence the Decedent had previously placed in White was aptly demonstrated by the Decedent's appointment of White as an attorney-in-fact under his durable power of attorney in 2003. Certainly, by 2008, White would not have had to spend any time discussing Decedent's family dynamics or the extent of his assets, and his testimony that Decedent was freely and voluntarily making the 2008 documents would have been most compelling. What makes Hackett's use of Logan, instead of White, a suspicious circumstance is that the grooming of a person to influence a change in testamentary documents often begins by removing a long-time, trusted legal adviser from the picture. Here, the explanation that White was nearing the end of his career evaporates when one considers that the substituted Kansas counsel had retired from 2 decades on the federal bench, which one would presume would place Logan in the twilight of his career, as well.

*Other Circumstances*

The district court was suspicious of a number of other circumstances, including the fact that no one presented a voided or cancelled personal property list. The court pointed to evidence that Decedent had religiously maintained and updated the separate list of personal property that was bequeathed to various persons, including the children. But it is just as reasonable that a meticulous and detail-oriented person would destroy such a list once it became invalid, rather than mark it void or cancelled. In other words, the absence of a voided or cancelled personal property list, under the facts of this case, does not present a suspicious circumstance.

Likewise, the district court was concerned about various changes in the trust and will provisions, such as the inclusion of the spousal consent and in terrorem provisions which were superfluous and unnecessary given that the spouse got everything and the children got nothing. The court felt that the unnecessary provisions acted to confuse the reader as to the practical effect of the instruments and to mask what was really being done. Certainly, the spousal consent could have led an uninformed Decedent into believing that the spouse was consenting to part of the estate going to someone else and that the in terrorem clause was there because the children got some, but not all of the estate, which they would lose by contesting the spousal share. But the fact that those clauses were inserted into the 2004 documents makes perfect sense, given the testimony that Decedent wanted to assure that Kathleen had hassle-free, lifetime care. Then, leaving those provisions in the 2008 documents, while perhaps confusing, cannot carry the burden of being clearly and convincingly suspicious.

Further, the district court thought it suspicious that the new estate plan removed the corporate trustee as the successor to replace Decedent. But as Hackett testified, it is not uncommon for a spouse receiving all of the property to be named the successor

trustee. In this case, the corporate trustee named in the prior trusts performed an important and necessary function, other than just helping Kathleen manage her affairs. Those prior trusts gave Kathleen a life estate in the trust assets, plus the right to have such amounts of the principal paid to her or for her benefit as was necessary for her support, maintenance, health, or education, *i.e.*, an invasion of the principal had to be based upon ascertainable standards. A trustee other than Kathleen was necessary to make the determination that the ascertainable standard was present that would permit an invasion of the trust principal. If Kathleen could have decided for herself that she needed the principal for her support and maintenance, the life estate would have been illusory. The 2008 trust did not require an independent trustee for ascertainable standards purposes because Kathleen got all of the principal, whether she needed it or not. In other words, the elimination of the independent corporate trustee under the facts surrounding the 2008 documents cannot be labeled a suspicious circumstance.

The district court was also perplexed as to why the 2008 trust omitted a spendthrift clause that would protect Kathleen's share of the trust from creditors. But, again, the change from giving Kathleen a life estate in the trust assets to vesting full ownership in her can explain that change. A spendthrift clause could not protect those assets in which Kathleen acquired full ownership rights. Therefore, we do not find that to be a suspicious circumstance.

Accepting that it was Decedent's intent to eliminate any hassles or estate disputes that Kathleen might encounter after his death, the district court found it suspicious that Decedent would devise an estate plan that greatly increased the odds of a challenge from the children. By secretly disinheriting his children, in favor of Kathleen and her family, Decedent almost assured the ensuing animus and will contest. Kathleen responds that a life estate carries the potential for constant conflict over whether the life tenant is spending too much money or not properly maintaining the property that will eventually

go to the remainder beneficiaries. Nevertheless, the district court opined that the abrupt, wholesale change to the estate plan, completely cutting off the children, was not the work of "a smart and meticulous businessman" such as Decedent. Rather, the court found that "[t]his is more clearly Patricia Hackett's estate plan tainted by her interest in protecting Kathleen, acting more as Kathleen's agent."

The district court concluded its oral ruling by reciting that the parties had determined that certain questions of fact were material to their respective clients' positions and had to be answered in the respective party's favor in order to obtain judgment. The court then provided answers to those questions. First, the court held that Kathleen caused to be drafted or induced the 2008 changes to the Decedent's estate plan through the agency of Patricia Hackett. Second, the court said that Decedent was not provided independent legal advice prior to the execution of the 2008 changes to his trust because Hackett was conflicted by emotional ties and Logan merely performed his referral services as a courtesy to what he believed was the long-time Indiana lawyer and counsel of Decedent. Next, to the question of whether Kathleen influenced Decedent through coercion, compulsion, or restraint that destroyed his free agency in the execution of the 2008 changes to his trust, the court answered that, through Hackett's masking the actual effect of the legal documents, the intent of Decedent was missing from the plan that was executed. To the question of whether the undue influence directly affected Decedent's 2008 changes to his trust, the court answered "yes," further explaining that the 2008 changes did more than meet Kathleen's needs, which had already been done in 2004. Next, the court held that the facts established by the plaintiffs constituted "suspicious circumstances" surrounding the preparation and execution of the 2008 changes to Decedent's trust. The court further held that the plaintiffs had demonstrated undue influence by clear and convincing evidence, leading to the final conclusion that the 2008 trust executed on May 2, 2008, was invalid.

On review, Kathleen contends that the district court went astray when it failed to require the plaintiffs to present evidence that the suspicious circumstances actually caused an undue influence that destroyed Decedent's free will and agency. But as the children argue, requiring direct evidence of undue influence would defeat the purpose of the suspicious circumstances doctrine, which provides an alternative method of establishing undue influence through circumstantial evidence. Moreover, K.S.A. 60-413 provides, in relevant part, that a "presumption is an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact." Accordingly, once a contestant proves the existence of suspicious circumstances, then the assumption of a fact—undue influence—has been established.

To reiterate, our task is to assess the existence of substantial competent evidence to support the district court's findings of suspicious circumstances. We do not look at the case anew, making our own assessment of witness credibility and weighing the evidence in favor of the plaintiffs against evidence in favor of the defendant. In other words, an appellate court does not function as a super trial court. Yet, that is what the Court of Appeals did. It rejected the district court's assessment of Logan's credibility in favor of its own assessment that his testimony was credible. Then, the panel determined that Logan's testimony in favor of the defendant trumped all of the other evidence favoring plaintiffs' allegations of suspicious circumstances, resulting in the panel's holding that suspicious circumstances did not exist. See *Cresto v. Cresto*, No. 108,547, 2013 WL 5610245, at *15 (Kan App. 2013) (unpublished opinion). We disagree with the panel's process and with its result.

Given the factual background presented in this case, the district court had substantial competent evidence from which to find that the plaintiffs had established, by clear and convincing evidence, the existence of some of the suspicious circumstances that it detailed in its oral findings. The suspicious circumstances that were supported by

substantial competent evidence were enough to create a presumption of undue influence. Then, it was incumbent on defendant to rebut that presumption.

## REBUTTAL OF PRESUMPTION OF UNDUE INFLUENCE

Because it found insufficient evidence to support the trial court's suspicious circumstances, the Court of Appeals was not required to move to the next step of determining whether Kathleen had rebutted the presumption of undue influence created by those suspicious circumstances. Although Kathleen does not specifically argue that she successfully rebutted any presumption, she makes arguments that are germane to that question, such as asserting that Logan gave independent legal advice and ascertained Decedent's free will and agency. Accordingly, we will address whether the district court erred in finding that Kathleen failed to carry her burden to rebut the presumption of undue influence created by the suspicious circumstances.

### Standard of Review

As noted, the district court made the negative finding that Kathleen had failed to meet the burden of proving that the suspicious circumstances did not, in fact, mean that Decedent was unduly influenced to make an unwanted testamentary disposition. The limitations on a person's ability to disprove a negative dictate a special standard of review, as we have explained:

> "The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which

the trial judge may have believed." *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976).

*Analysis*

Kathleen contends that the trial court arbitrarily disregarded the undisputed evidence that Decedent was very strong-willed and organized; he was articulate with a sharp mind; he was detail-oriented and meticulous; he was competent at the time he executed his 2008 estate planning documents; and he initiated the 2008 changes before he was diagnosed with prostate cancer. Again, those arguments ask us to reweigh and reassess the evidence.

The district court did not disregard evidence of Decedent's character and personality traits. In fact, the court relied on that evidence to opine that Decedent was not the kind of man to disinherit his children, when it was unnecessary to accomplish his goals. Certainly, one can debate whether Kathleen's assessment of the effect of Decedent's traits should have controlled the outcome. But one cannot say that the district court ignored Decedent's traits, when it stated on the record: "By all the evidence, Francis was an honorable man, proud, loving, caring, meticulous, loyal, detail-oriented, devoted and a family man." The court then proceeded to opine that "[t]he 2008 documents do not appear to be the intent of such a person" and that the estate plan "does not comport with the picture of the character of Francis that was painted by both sides in this case."

Likewise, the district court did not ignore the fact that Decedent initiated the 2008 amendment to his will and trust. Rather, the court questioned whether Decedent asked for all of the changes in Hackett's documents:

"There's no direct communication from Francis before or after the execution of the documents at issue that he intended or desired to completely cut off his children or redirect the Cresto family heirlooms to the Koehler family or to force his brother to be an unwilling partner in the Cresto family real estate with Kathleen and her family, leaving his own children with no part of that heritage."

Granted, the district court's finding that Hackett masked the actual effect of the legal documents is somewhat contradicted by the specific language in the documents that Decedent was omitting his children in favor of Kathleen. But as will be discussed below, the court did not believe that Logan thoroughly reviewed the documents with Decedent.

Kathleen also argues that the record is completely devoid of any evidence that she personally exerted undue influence on Decedent. But, again, the district court did not ignore this fact. Rather, the district court found that the undue influence came through Hackett for the benefit of Kathleen. See *Harper v. Harper*, 274 Ga. 542, 543, 554 S.E.2d 454 (2001) (quoting 79 Am. Jur. 2d, Wills § 394, p. 553) ("'A will may be invalidated because of undue influence of which the beneficiary was entirely ignorant.'").

Likewise, the district court did not arbitrarily disregard the defense's evidence of the purported reasons for the 2008 disinheritance of the plaintiffs. Rather, the court was not persuaded by that argument. For instance, the court rejected the argument that Decedent was disinheriting his children because they were financially secure because the evidence established that Steven and Terese were struggling financially at the time of the 2008 estate plan changes and that Decedent was aware of their circumstances.

Finally, and perhaps most importantly, Kathleen argues that the district court arbitrarily disregarded the following undisputed evidence of record indicating that Logan provided Decedent with independent legal advice: (1) Logan was specifically retained to review the 2008 estate plan documents and ensure they comported with Decedent's

32

wishes; (2) Logan expressly testified that he understood his role was to ensure that the documents carried out Decedent's intent; (3) Logan testified he spent approximately half an hour with Decedent to ensure that he understood his 2008 estate planning documents and that they carried out his intent and will; (4) Logan specifically testified that he talked to Decedent about the big changes to his estate plans; and (5) Logan's opinion that Decedent was not unduly influenced in requesting and executing the 2008 documents. Those facts would be compelling evidence in support of rebutting the presumption of undue influence, if the district court had either found them to be true or ignored them. But that did not occur.

As noted, the district court found that Logan provided a professional courtesy to Hackett by taking care of the formalities of executing the documents, rather than acting as independent counsel to Decedent. The court specifically found Logan did not counsel Decedent as he would have counseled one of his own clients. Pointedly, the district court stated that it did not find credible the testimony that Decedent discussed disinheriting his children with Logan. The court found that the time Logan spent with Decedent was insufficient to thoroughly review the estate plan documents; that Kathleen had been present during Decedent's consultation with Logan but did not corroborate that they discussed disinheriting his children; and that Logan apparently did not fully understand the documents because he misrepresented to the children the effect of Decedent's death on the continuation of the trust.

While one can understand the Court of Appeals panel's disbelief that an esteemed retired federal Court of Appeals judge would provide incredible testimony, that was simply not its call. If appellate courts say that they are not to reassess witness credibility from a cold record, then such constraint must be consistent in order to provide all litigants with fair and equal treatment. Accordingly, we decline to nullify the trial court's disbelief of the evidence asserted by the defense with respect to Logan's counsel and, therefore, we

cannot disturb the court's ruling that Kathleen failed to carry her burden to rebut the presumption of undue influence in the preparation and execution of the 2008 estate plan documents.

In short, we reverse the Court of Appeals and affirm the district court's holding that the 2008 estate plan documents were invalid because of undue influence, thereby resurrecting the 2004 testamentary documents.

ATTORNEY FEES

Because we are affirming the children's district court challenge to the 2008 estate plan documents, we must address their complaint that the district court erred in declining their request for their attorney fees to be paid out of Decedent's estate assets. In the district court, the children based their attorney fees request on K.S.A. 58a-1004, which provides:

> "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, *may* award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." (Emphasis added.)

*Standard of Review*

Given that the awarding of attorney fees under K.S.A. 58a-1004 is discretionary, our review of a district court's decision regarding attorney fees under that statute is necessarily subject to our abuse of discretion standard. *In re Estate of Somers*, 277 Kan. 761, 773, 89 P.3d 898 (2004). In the context of the abuse of discretion challenge mounted here, we assess whether no reasonable person would adopt the position taken by the

34

district court. 277 Kan. at 773. We reject the children's argument that a de novo review is appropriate here.

*Analysis*

Before us, the children make no compelling argument as to why the district court abused its discretion in refusing to award attorney fees under K.S.A. 58a-1004. Moreover, we cannot divine such an argument on our own. The children's action did not enhance the value of the assets in Decedent's estate. Indeed, the district court found that justice and equity dictated that no fees should be awarded from the trust because such an award would deplete the trust's ability to care for Kathleen, as Decedent clearly intended. That decision was well within the realm of reason.

Instead of attacking the reasonableness of the district court's ruling, the children attempt to change gears. For the first time on appeal, the children claim entitlement to fees pursuant to K.S.A. 59-1504. But the district court did not have an opportunity to consider that argument, and we decline to act as the trial court on appeal. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011) (issues not raised before the trial court cannot be raised for the first time on appeal).

The children proffer the further argument that they should be awarded attorney fees under the common fund doctrine. This court recently rejected such an argument, refusing to apply a common fund exception to the rule that Kansas courts may not award attorney fees absent statutory authorization or party agreement. *Gannon v. State*, 298 Kan. 1107, 1196, 319 P.3d 1196 (2014). We see no compelling reason to apply this narrow equitable doctrine here when it is normally applied in class action cases. See *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 287-88, 241 P.3d 15 (2010).

In conclusion, we reverse the Court of Appeals and affirm the district court on all issues.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 108,547 and 109,059 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.