NOT DESIGNATED FOR PUBLICATION

No. 114,251

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption
of K.R.D.

MEMORANDUM OPINION

Appeal from Labette District Court; JEFFRY L. JACK, judge. Opinion filed February 26, 2016.
Reversed.

*Cole A. Hoffmeister*, of Emert, Chubb & Gettler, LLC, of Independence, for appellant.

*Richard G. Tucker*, of Tucker and Markham Attorneys at Law, LLC, of Parsons, for appellee.

Before STANDRIDGE, P.J., LEBEN and POWELL, JJ.

LEBEN, J.: The case before us involves a 5-year-old girl, K.R.D., the parental
rights of her natural father, who is in prison, and the desire of K.R.D.'s stepfather to adopt
her. The stepfather can't adopt K.R.D. without either the father's consent (which has been
denied) or a court order that the father failed to fulfil his duties as a parent for the 2-year
period before the stepfather filed his adoption petition.

After an evidentiary hearing, the district court granted the stepfather's petition,
concluding that the father's consent wasn't required because he hadn't fulfilled his
parental duties for the 2-year period. Granting the stepfather's adoption petition also
serves to terminate the father's parental rights. The father has appealed, and we must now
determine whether the district court's ruling was properly supported by the evidence.

Let's start by reviewing the factual background, as it was presented in evidence to the district court. The key players are K.R.D.'s father ("Father"), K.R.D.'s mother ("Mother"), and K.R.D.'s stepfather ("Stepfather"). Father's parents ("Grandfather" and "Grandmother") also play important roles.

Mother and Father married in Texas in 2007. At the time, Father was on probation for possession of child pornography; Mother testified that she had been aware of the conviction but that Father had told her it involved video of him as a high school senior having sex with his girlfriend.

K.R.D. was born in October 2009. Mother and Father had been living with Grandfather and Grandmother, but Father moved out (to a nearby residence) shortly before K.R.D.'s birth because his probation restrictions prevented him from living with anyone under the age of 18. Things apparently proceeded in a normal fashion—or as normal as they could with Father living separately—until January 2010. That's when Father was arrested on federal charges for attempted possession of child pornography. Father has been incarcerated since then—both for violation of his Texas probation and ultimately for the federal conviction. Father is set to be released in June 2023; K.R.D. will then be 13. We should note that Father's federal conviction is based on his actions from 2008, well before K.R.D.'s birth.

When Father was initially arrested, he was held in a county jail; Mother regularly brought K.R.D. to visit him. In 2011, Mother lost her teaching job and moved with K.R.D. to Joplin, Missouri, to be closer to her family. The next year, in 2012, Father was transferred to a federal prison in Petersburg, Virginia.

These moves further impacted Father's contact with K.R.D. Until March or April 2013, however, Mother let K.R.D. have monthly extended visits with Grandmother and Grandfather. During those visits, his parents would arrange for Father to call K.R.D., and

2

they would talk for up to 15 minutes. In addition, Mother let the grandparents take K.R.D. to visit Father in prison in July 2012, August 2012, and March 2013. (Mother accompanied K.R.D. on the August 2012 visit.) Each visit covered a 2-day period, with contact from about 9 a.m. to 3 p.m. each day.

Mother had divorce papers served on Father in January 2012, and the trial court in Jasper County, Missouri, granted the divorce that June. The divorce decree gave Mother sole legal and physical custody of K.R.D.; Father received supervised visitation rights. Given his incarceration, the court didn't order that he pay any child support until he was released from prison; at that time, Father is to pay $252 a month.

While in prison, the parties agree that Father earns $25 to $27 a month for prison work; he spends $20 of that to have telephone and email privileges. Father did not provide any financial support to Mother in the 2-year period before April 24, 2014, when Stepfather filed the adoption petition.

Mother began dating Stepfather about 1 year before that, in March 2013. They moved to Altamont, Kansas, in July 2013 and married in October 2013. In August 2014, they moved to Cherryvale, Kansas.

At some point, Father was transferred to a low-security federal prison in Beaumont, Texas. Mother has not allowed K.R.D. to visit him there, although Father and his parents have asked her to do so. The grandparents testified that whenever they tried to arrange visits for K.R.D., Mother would say she had plans and that K.R.D. couldn't go. In December 2013, she told the grandparents that she wasn't comfortable with K.R.D. being around other sexual offenders at the prison.

Mother eventually changed her phone number and blocked calls from Father. She said she had cut off communication with him because he had focused on her personal life

3

and hadn't inquired about K.R.D. She said she would have let him continue to call had he stuck to talking only about K.R.D.

Father testified that he had called to speak with K.R.D. two to four times a week until Mother changed her telephone number, which happened in March 2013. After that, Father often asked his parents to relay messages to Mother, asking that she allow K.R.D. to speak with or visit him.

After Mother's move to Kansas, Mother provided her address to Grandmother and Grandfather. She testified that she had also sent a letter to Father notifying him of the move but then told the court that she had had an agreement with the grandparents not to share her address with Father without her permission:

> "Q: . . . . So unless he had your permission, [Grandfather] or [Grandmother] could not provide your contact information with [Father], correct?
> "A: Right."

Father testified that he hadn't received a letter from Mother and that his parents had never given him her address: "The only thing that they would tell me was that she had moved to Kansas," he said. The grandparents testified that they hadn't given that information to Father because Mother hadn't given them permission to and because they hadn't wanted Mother to be angry with them. But the district court concluded that Mother "never withheld permission . . . to share her address or phone number" with Father.

Father sent email requests to Mother to allow contact from him through a prison email system. (In most prison email systems, messages may be sent only to people who have agreed to receive them.) According to Father, a month or two before Stepfather filed his adoption petition, Mother agreed to accept email from him through the prison system, and he sent her two email messages but got no reply.

4

The parties agree that K.R.D. knows Father as her "daddy." They also agree that Father hasn't sent any cards, letters, or gifts to K.R.D. while he has been incarcerated.

With this background, let's move on to the legal issues that we must address. Our starting point is the special statute addressing stepparent adoptions, K.S.A. 2015 Supp. 59-2136(d).

Under that statute, a stepparent adoption may proceed in two situations: (1) if both of the child's natural parents consent to the stepparent adoption or (2) if a court determines that consent is not required from any nonconsenting parent. The statute provides that the father must consent "unless such father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving such consent." K.S.A. 2015 Supp. 59-2136(d). (The statutory language presumes that the nonconsenting parent will be the father, but that language is meant to cover either parent, depending on the situation. See K.S.A. 2015 Supp. 59-2136[b].)

So the initial question the trial court had to answer was whether Father had failed or refused to assume his parental duties for the 2-year period before the adoption petition was filed on April 24, 2014. If the court answered yes to that question, then it had to decide whether the adoption should be granted—at which point it could consider the best interests of the child and whether Father was a fit parent. See K.S.A. 2015 Supp. 59-2136(d). The district court answered yes to both questions and granted the adoption. Doing so also terminated Father's parental rights. See K.S.A. 2015 Supp. 59-2136(i).

Whether a parent has failed or refused to assume parental duties is a factual question, so we review the case on appeal to determine whether the district court's conclusion is supported by substantial evidence. *In re Adoption of J.M.D.*, 293 Kan. 153,

170-71, 260 P.3d 1196 (2011). But see *In re Adoption of C.L.O.*, No. 101,944, 2009 WL 3378217, at \*2-3 (Kan. App. 2009) (unpublished opinion) (suggesting, before *In re J.M.D.*, that the district court's factual findings in a stepparent adoption must be proved by clear and convincing evidence because action also terminates parental rights); *E.R.S. v. O.D.A.*, 779 P.2d 844, 847-48 (Colo. 1989) (applying clear-and-convincing-evidence standard in stepparent adoption). Substantial evidence is evidence that a reasonable person would accept as sufficient to support a conclusion. *Cresto v. Cresto*, 302 Kan. 820, 835, 358 P.3d 831 (2015). We review the facts in the light most favorable to Stepfather, who was the prevailing party in the district court, because the district court is the factfinder; we do not reweigh the evidence or make credibility determinations. *In re J.M.D.*, 293 Kan. at 171. Even so, the district court cannot ignore undisputed evidence without some good reason. See *Cresto*, 302 Kan. at 845.

Our appellate review is also guided by some legal rules, including some that apply specifically when the nonconsenting parent is incarcerated. In considering whether a nonconsenting parent has failed to assume parental duties, the district court should consider all of the surrounding circumstances. *In re J.M.D.*, 293 Kan. at 167. The Kansas Supreme Court has also recognized that an incarcerated parent has significant limitations on the ways in which he or she can carry out parental duties. Accordingly, the court must look to whether that parent has pursued the opportunities that are available to the best of his or her ability. *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995); *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987). What's required is that "the parent [have] made reasonable attempts, under all the circumstances, to maintain a close relationship with his or her child." *In re Adoption of A.J.P.*, 24 Kan. App. 2d 891, 893, 953 P.2d 1387 (1998). These rules interpreting the stepparent-adoption statute are in keeping with the general rule that adoption statutes are strictly construed in favor of maintaining the rights of the natural parents, a rule based on the natural parent's fundamental constitutional right to raise his or her child. See *In re Adoption of Baby Girl*

*P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010); *In re S.E.B.*, 257 Kan. at 273; *In re F.A.R.*, 242 Kan. at 235-36.

In support of its conclusion, the district court cited two primary underlying facts:

- Father had not sent Mother any money for K.R.D.'s support.
- Father had not sent any letters, cards, or gifts to K.R.D.

In addition, the court rejected any claim by Father that his lack of contact was due to Mother's interference. The court said that (1) Father's parents had Mother's address and telephone number and (2) Father "could have filed a motion in Jasper County, Missouri[,] to specify parenting time, telephone contact[,] and sharing of addresses" if Father "truly thought [Mother] was interfering with his relationship with [K.R.D.]"

In our view, these facts, given the surrounding circumstances, do not support the conclusion that Father has failed or refused to assume parental duties for the relevant 2-year period. Let's take them one by one.

First, while Father had not sent any money, he had virtually no money to send. Our Supreme Court considered similar situations in *In re F.A.R.* and *In re S.E.B.* In *In re F.A.R.*, the father earned $9 per month working at the prison, which he spent for toiletries not provided to him. Our Supreme Court affirmed the district court's finding that the stepfather hadn't shown that the father had failed to assume parental duties, in part by failing to provide support. 242 Kan. at 239-40. In *In re S.E.B.*, our Supreme Court simply noted that "[i]t [was] obvious from the facts that while in prison Father was not financially able to support the children." 257 Kan. at 274. In our case, Father reasonably spent most of his meager prison earnings to communicate with his family by phone and email. He wanted to use those means to communicate with K.R.D. as well. We don't know what fees Father might have been charged to transmit the remaining $5 to $7 a month to Mother for K.R.D., but the failure to send money in these circumstances does not show a failure or refusal to assume parental duties.

Second, while Father had not written to K.R.D. or sent her gifts, the parties both presented testimony that he did not have Mother's address. The district court found that Mother had "told [Father] by letter that she had moved to Altamont, Kansas" but also found that she "gave her address and phone number to [Father's] parents." The district court recognized that Grandmother had said "she did not share this information because she did not want [Mother] to get mad at her," though it said there was "no evidence to support [Grandmother's] assumption" that sharing the information would have angered Mother. The court concluded that the grandparents could have shared the information with Father, but all evidence presented said they didn't. Whether *Father* failed to fulfil *his* parental duties cannot rest on the decision of his parents not to provide him with Mother's address and phone number.

Third, the district court suggests that Father could have gotten around this problem by simply filing a motion in Jasper County, Missouri, where the divorce was granted, asking the court's assistance in getting the address and phone information as well as obtaining contact with K.R.D. But the district court's assumption that the court in Jasper County, Missouri, could enter further orders is incorrect. Mother and K.R.D. moved from Missouri to Kansas in July 2013. Before that, Father *knew* where Mother lived, and Mother allowed the grandparents to take K.R.D. to visit Father at the prison as late as March 2013. Given Father's residence in Texas, the Missouri court lost exclusive jurisdiction over child-custody matters once Mother and K.R.D. moved to Kansas. See K.S.A. 2015 Supp. 23-37,202; Mo. Rev. Stat. § 452.745 (2013 Supp.). And the Missouri court lost jurisdiction altogether—and could not enter any valid orders—once neither the child nor a parent had lived in Missouri for 6 months. See K.S.A. 2015 Supp. 23-37,202(b); K.S.A. 2015 Supp. 23-37,201; Mo. Rev. Stat. § 452.740 (2013 Supp.). That 6-month period ended in January 2014, well before Stepfather filed his adoption petition.

8

It would be difficult at best for a federal prison inmate in Texas to get an appropriate motion on file in Jasper County, Missouri, and to arrange whatever hearings might be required to get it granted. It would be virtually impossible for that inmate to get the case formally transferred to Kansas—first filing certified copies of the Missouri divorce decree, then filing some motion for modification of the child-custody provisions, and then getting an order entered by a Kansas court. Father had virtually no funds available to even attempt to get certified copies of court papers, let alone to hire an attorney. And we are aware of no legal-aid program in Kansas that provides free services to out-of-state federal prisoners. While Father's family might have helped him with these matters, we again conclude that *his* parental rights—and whether *he* failed to fulfil his parental duties—do not rest on the actions taken by his parents.

For these reasons, then, we conclude that substantial evidence did not support the district court's finding that Father had failed or refused to assume his parental duties for the 2-year period before Stepfather filed for adoption. Father attempted to stay in contact with K.R.D. by requesting telephone and in-person visits that have not taken place through no fault of his—other than that his past crimes led to his imprisonment. But Father has "made reasonable attempts, under all the circumstances, to maintain a close relationship" with K.R.D. See *In re A.J.P.*, 24 Kan. App. 2d at 893. That means that Father's consent would be required for the stepparent adoption, and since Father hasn't consented, the adoption cannot proceed.

Although the analysis to this point of the opinion is sufficient, in our view, to decide this appeal, we do want to add some additional comments to address two other topics raised by the parties in their appellate briefs or by the district court:

- Stepfather emphasizes that Father will be in prison for many more years, making it impossible for him to provide the type of care and support for K.R.D. that a parent should provide. The district court similarly noted that Father's inability "to be a parent to his child" had been "for reasons of his

9

own making," presumably the crimes he committed and the sentences imposed for those crimes. If this were a proceeding in which the court was asked to determine whether Father was unfit as a parent (a finding that can lead to termination of parental rights if the child is in need of care), Father's long-term imprisonment might be grounds to terminate his parental rights so as to give the child a permanent home. See, *e.g.*, *In re A.A.*, No. 110,647, 2014 WL 2619396, at *4-5 (Kan. App.) (unpublished opinion) (affirming termination of parental rights based on father's unfitness due to long-term incarceration), *rev. denied* 300 Kan. 1103 (2014). Here, of course, K.R.D. has a permanent home with Mother and is already well cared for by Mother and Stepfather. Moreover, the text and structure of the stepparent-adoption statute make it clear that whether Father is a fit parent—something that might well be at issue given his imprisonment and his convictions for possession of child pornography—is *not* the relevant question when the court determines whether he has failed to fulfil his parental duties. Nor does the best interest of the child come into play unless the court first concludes that Father failed to fulfil his parental duties for the 2 years before Stepfather filed for adoption. See K.S.A. 2015 Supp. 59-2136(d); *In re J.M.D.*, 293 Kan. 153, Syl. ¶¶ 3-4.

- Both Stepfather and the district court rely on *In re J.M.D.*, in which the Kansas Supreme Court affirmed a district court's conclusion that an incarcerated father hadn't fulfilled his parental responsibilities for the 2-year period, in part due to incarceration. But the facts in *In re J.M.D.* differ from our case in important ways. Most significant is that the father in *In re J.M.D.* had significant in-person contact with the children—but he had caused the death of another child in the home by, according to the criminal charges, "'beating, kicking, hitting, knocking to the ground and by throwing water on [that child].'" 293 Kan. at 155. The other children suffered from symptoms of posttraumatic stress disorder based on the father's actions, and

the court said that "[a] father who verbally berates and abuses his child is not assuming a parental duty, even if that contact is made three times a day." Moreover, the court said that any assessment of the father's contact with the children in that case "cannot be divorced from their prior relationship, *e.g.*, a child having observed his father kill another child." 293 Kan. at 173. The case now before our court is more like *In re S.E.B.*, 257 Kan. 266, and *In re F.A.R.*, 242 Kan. 231, in which the court held that the evidence did not show that the incarcerated fathers had failed to fulfil their parental duties for a 2-year period, than it is like *In re J.M.D.*

In sum, the district court's finding that Father had failed or refused to fulfil his parental duties was not supported by substantial evidence. We therefore reverse the district court's judgment.