NOT DESIGNATED FOR PUBLICATION

No. 123,469

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

R.W.,
*Appellant*,

v.

C.M.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Osage District Court; SHANNON D. RUSH, magistrate judge. Opinion filed July 22, 2022. Affirmed.

*James G. Chappas*, of Topeka, for appellant.

*Cooper Overstreet*, of The David Law Office LLC, of Lawrence, for appellee.

Before WARNER, P.J., CLINE, J., and RACHEL L. PICKERING, District Judge, assigned.

PICKERING, J.: R.W. appeals from the denial of her petition for a protection from stalking (PFS) order. The district court found that R.W. failed to meet her burden of proof and dismissed the petition. On appeal, R.W. first argues that the district court erred by not issuing temporary orders based on the evidence presented.  That issue was rendered moot by the issuance of the district court's final order. The second issue, namely, whether the district court could reconsider the denial of temporary orders even if new facts arose does fall under an exception to the mootness doctrine. In other words, the question of whether the district court can consider successive requests for temporary protection orders based on facts arising after the original petition is an issue of public importance capable of

repetition. The district court erred in finding that it could not entertain a successive request for temporary protection orders based on new facts. Yet the error was harmless because the court did issue a final order. R.W. also argues that the district court erred when it held that it could not sequester witnesses in PFS proceedings. This was an error because the power to sequester witnesses, including PFS proceedings, falls within the broad discretion of the district court. But the error was harmless because there is no indication that any of the witnesses' testimony was impacted by the district court's refusal to sequester. Finally, R.W. argues that she presented sufficient evidence to support her case. Many of the facts, however, are controverted, and this court cannot reweigh evidence. *Trolinger v. Trolinger*, 30 Kan. App. 2d 192, 197, 42 P.3d 157 (2001). The record supports the district court's decision.

FACTUAL AND PROCEDURAL HISTORY

This case involves a petition for protection from stalking. Under Kansas law, "stalking" is defined as "an intentional harassment of another person that places the other person in reasonable fear for that person's safety." K.S.A. 2020 Supp. 60-31a02(d). For the purposes of the protection from stalking statutes, "'[h]arassment' means a knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose." K.S.A. 2020 Supp. 60-31a02(d)(1). "Course of conduct" is also defined, and it "means conduct consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress." K.S.A. 2020 Supp. 60-31a02(d)(2). The definition of "course of conduct" does not include constitutionally protected activity. K.S.A. 2020 Supp. 60-31a02(d)(2).

After a person files a petition for protection from stalking, the district court must hold an evidentiary hearing within 21 days unless the hearing is continued. K.S.A. 2020

2

Supp. 60-31a05(a). The district court may issue temporary relief orders before the hearing on the petition. K.S.A. 2020 Supp. 60-31a05(b).

R.W. filed a verified petition for protection from stalking against C.M. on May 5, 2020. R.W. alleged that on April 28, 2020, her neighbor—C.M.—entered her property, taunted her horse, stunned the horse with a flashlight, and threw rocks at the horse. She also alleged C.M. entered her yard twice on the night of April 29, 2020, and threw things at her house. She said that police found C.M. on her property and detained him. R.W. explained that these incidents occurred on a daily basis, despite her installation of security cameras and "no trespassing" signs and numerous calls to the police. Under the "Additional Incidents" portion of her petition, R.W. alleged that C.M. once threw a hatchet at her after she confronted him about stealing her water. And R.W. said that bullets fired from C.M.'s property hit her horse, one of the neighbor's children, and another neighbor's outbuilding. R.W. concluded that she was afraid for her safety, as well as the safety of her pets, because C.M. was armed and dangerous, he threatened her and abused her pets, and he frequently trespassed onto her property. R.W. asked the court to enter an ex parte temporary order of protection. The district court denied the request for ex parte temporary orders the same day, though the court did not issue a written ruling.

The hearing was initially scheduled for June 17, 2020. It is not apparent from the record why the hearing was not scheduled within 21 days of R.W. filing her petition, but that is not at issue in this case. Just over a week before the June hearing, R.W. moved for a continuance. The district court ultimately scheduled the hearing for September 4, 2020.

On June 22, 2020, R.W. moved the district court to reconsider its denial of her request for a temporary protection order. Her motion stated that since R.W. filed her petition on May 5, 2020, C.M. had continued his harass, threaten, and assault R.W. and her horse. She alleged that "[e]very night on the hour and from 10:00 pm until 5:00 am, [C.M.], ordinarily dressed in black with a flashlight and night vision gear, 'patrols' the

3

western property line of [R.W.'s] property screaming that he is to be called 'Sir' and 'Specialist' and that 'No woman is going to tell him what to do.'" During his patrols, R.W. alleged, C.M. would call out to her horse and shine his flashlight in the horse's stall and face. This behavior made R.W. fear for her safety and experience difficulty sleeping at night. She specifically alleged that the weekend before filing the motion "[a] rock was thrown at the horse, from the defendant's property striking the animal causing a hole in his leg." Although R.W. called the police, she said one of the people with C.M. said "that the Sheriff will do nothing to them." R.W. asked the court to issue a temporary protection order based on this additional evidence.

The district court heard arguments on the motion in August 2020 and denied R.W.'s motion for reconsideration. The district court reasoned that there was no procedural scheme or legal precedent by which it could reconsider its initial ruling on temporary orders based on new facts. Additionally, the court noted that the statutory intent behind the Protection from Stalking, Sexual Assault, or Human Trafficking Act, K.S.A. 2020 Supp. 60-31a01 et seq. (Act), was that matters be heard expeditiously, which is why it provides for a final hearing to be conducted within 21 days.

There was some confusion as to whether the district court would receive evidence at the August 2020 motions hearing. R.W.'s attorney believed that it was an evidentiary hearing. Based on this belief, R.W.'s attorney orally moved at the beginning of the hearing to sequester any witnesses that were planning to offer testimony. The district court and C.M.'s attorney both thought the purpose of the hearing was to hear arguments on the motion for reconsideration and another unrelated motion, not to present evidence. In any event, the district court denied R.W.'s request for sequestration. The court reasoned that because the case was a civil matter, the sequestration rules would not apply like they would in a criminal case. In its written order following the hearing, the district court reasoned that "there is no legal precedent to justify that requested relief in the type of cause of action filed by [R.W.]."

4

Shortly before the bench trial, R.W. filed a written motion for sequestration of testifying witnesses and an order precluding recording of trial proceedings by anyone in the gallery. R.W. asserted that sequestration would "go a long way to ensure the efficient presentation of truthful facts to the Court" and that "[t]he probable alternative, in this case, will be a tedious, hillbilly free-for-all." R.W. acknowledged that Kansas law does not specifically authorize witness sequestration in civil trials, but also noted that it does not prohibit sequestration either.

The bench trial began on September 4, 2020, and was continued for a second day on October 2, 2020. Before the trial began, R.W. renewed her motion for sequestration. The district court held that there was no authority for a sequestration order and that the court did not generally order sequestration of witnesses in protective order proceedings. R.W. filed another motion for sequestration a few days after the first day of trial. She noted that one of the witnesses called was asked whether she had the opportunity to listen to the trial testimony that had been elicited up to that point and the witness replied affirmatively. R.W. "submit[ted] the clear intent and meaning of said inquiry being that the witness was going to be asked to provide answers to questions based upon what she had heard during the course of the hearing." R.W. asked the court to grant her motion to avoid similar situations in the future. The court denied the motion when trial resumed for the second day.

R.W. testified first. She said that she had lived at her home in Carbondale since 1997. R.W.'s neighbors included Emily and Ryan Roberts to the north and Ron and Patricia Cox to the southwest. At the times relevant to this proceeding, R.W. said, she lived alone.

R.W. bought a horse named Pie in 2004, who she housed in a barn adjacent to a fence on the west side of her property. Pie had a corral next to his barn and another corral

to the south of the barn. The southern pasture is between R.W.'s house and C.M.'s property.

C.M. moved into the property to the west of R.W. in late summer or early fall of 2017. R.W. thought she had an amicable relationship with C.M. when he moved into the neighborhood, though she did mention an incident in 2017 where C.M. was shooting a gun on his property. R.W. said that C.M.'s bullets went toward the Cox's house where their children were playing outside. Another bullet ricocheted and nicked Pie's ear. She thought the ricochet towards Pie was accidental. Although R.W. said the Cox children were the ones that C.M. shot at in that incident, the testimony later in the case focused on the Roberts children. C.M.'s attorney asked neighbor Emily Roberts whether she "had a conversation with [R.W.] concerning [her] kids being shot at or by as [R.W.]'s now testified." Roberts replied that she had a conversation with R.W. about the allegation and that it did not occur. When R.W. testified again on the second day of trial, she said she read on social media in a post by Emily Roberts about the Roberts children being shot. R.W. did not mention the Cox children.

R.W. testified that her relationship with C.M. changed about a year after he moved to the neighborhood. She explained that he became more demanding and accused her of stealing his land. After C.M. learned that R.W. had previously worked for Kansas Legal Services, R.W. said C.M. asked her to prepare legal documents regarding visitation with his child. R.W. further testified that C.M. used her water, took pollen from her pine tree, and sat on her deck to use her internet.

According to R.W., C.M. said he was former military and had been diagnosed with post-traumatic stress disorder and paranoid schizophrenia. R.W. said that C.M. reported being on medications and that without the medications he would see and hear things. For example, C.M. reportedly told R.W. that he could sometimes hear a woman or children screaming in the woods. He also suggested that he thought his home's previous

6

owners had been buried in the new concrete under his basement stairs. R.W. also said C.M. asked her to call the sheriff's department one night because he thought North Korean people were trying to dig through the gravel under his garage door. On other occasions, C.M. asked R.W. to watch him enter his house if it was dark out.

R.W. testified that in mid-2019, about 14 or 15 months before the trial, C.M. started patrolling their property line. He performed hourly patrols every night beginning around 9 p.m. and ending around 5 a.m. or 6 a.m. During these patrols, he would use floodlights or flashlights and walk up and down the property line. C.M. would typically wear black or camouflage. Others often accompanied C.M. on his patrols. Usually C.M. was accompanied by his friend Shane Henderson. Sometimes R.W. could hear C.M. saying things like, "'You will refer to me as specialist, or mister, or sir.'" She could also hear C.M. whistle and call Pie's name. C.M. would shine floodlights and flashlights on Pie and in Pie's face. R.W. also observed lasers being pointed at Pie's face.

R.W. began noticing that Pie had bloody cuts on him when she would go out to feed him in the morning. She could also hear Pie running and making scared snorting noises at night, and he would be lathered in the morning. R.W. thought Pie's injuries could have been caused by rocks being thrown at him and by Pie becoming so scared by C.M. and his dogs that he would run out of control. In response to Pie's injuries, R.W. installed two trail cameras, no trespassing signs, spotlights, and motion sensitive lights.

R.W. testified that there had been a lot of "patrolling and noise" on April 28, 2020. When she heard Pie snorting and running in the middle of the night, she checked the cameras and saw a projectile from the west and slightly southwest hit Pie. She submitted a photo into evidence that she took the morning after this incident which showed a quarter-sized gash on Pie's flank. When she returned to the stand on the second day of the trial, R.W. said she had also observed C.M. shining a flashlight on Pie's stall that night and that Pie appeared to be uncomfortable.

7

The following night, on April 29, 2020, R.W. was in her first-floor bedroom with the window open. She could hear men talking outside when something—she thought it was likely mud—hit her window and stuck to the screen. R.W. heard C.M. laugh and this was followed by other objects that sounded like pebbles or gravel being thrown at R.W.'s house. She admitted that she did not personally observe C.M. throwing anything. R.W. called the sheriff's department and someone from the sheriff's department spoke to C.M., but he was not arrested. R.W. stipulated that C.M. had never been arrested in relation to any of the complaints she made.

R.W. also testified that she was 66 years old and suffered from kidney issues. She had stage four kidney failure and was on the kidney transplant list. She said that the stress and lack of sleep caused by C.M. exacerbated her kidney failure.

Dan Scott, an acquaintance of R.W. for 10-15 years, testified next. Scott performed a variety of carpentry work for R.W. over the years, including work on Pie's corral. R.W. asked Scott to extend the stable to provide protection from projectiles and aggressive dogs. Scott also installed R.W.'s cameras.

In the year or so before the trial, Scott cared for Pie during times that R.W. was in the hospital. He said he "definitely" noticed a deterioration in Pie's health after C.M. moved into the neighborhood. Scott testified that since C.M. moved in he had observed "bloody nicks, pretty good size holes on his legs . . . a lot around his head." Sometimes he saw Pie with swollen eyes. He observed injuries to Pie every month of 2020 up to the time of trial.

Although Scott never saw C.M. injure Pie, he suspected C.M. was to blame. Scott said he spent "many nights out in the barn trying to . . . catch them in the act" of hurting Pie. He could see and hear that the projectiles were coming from the west of R.W.'s

8

property. He could also see C.M. shining flashlights on the horse during his nightly patrols. Scott testified that C.M. would bring his dog, which was barking and acting aggressive, within 10 to 15 feet of Pie and linger for five or so minutes. Despite watching C.M., Scott did not observe C.M. or anyone else throw anything at Pie.

R.W.'s neighbor Emily Roberts testified and claimed that R.W. told her the allegations in the petition were perjury. Roberts also testified that R.W. did not live alone as she claimed. Roberts lived close enough to R.W. to see her driveway and saw R.W.'s husband routinely coming and going to the house. Roberts also believed another woman moved in around July 2020 and spent almost all of her time at R.W.'s residence. Roberts also denied that C.M. ever shot a gun at her children. Roberts' testimony concluded with her saying that she installed cameras and a fence on her property to protect her family from R.W., who Roberts claimed had trespassed on her property, harassed her, and threated to "have Judges and Lawyers coming after" Roberts.

Eric Wood, C.M.'s neighbor to the north, provided testimony related to the allegation in R.W.'s petition that C.M. had shot a neighbor's outbuilding. He explained that he had an outbuilding that was hit by gunfire, but it was before C.M. moved in. Like Roberts, Wood could see R.W.'s property from his front yard. He saw additional vehicles parked at R.W.'s residence late at night and early in the morning and had witnessed cars coming and going from her house in such a way that he assumed someone else was living with R.W.

Shane Henderson, who described himself as a long-time family acquaintance of C.M.'s, also testified. He would spend a significant amount of time with C.M., usually visiting C.M. multiple times a week, typically from afternoon to early morning with occasional overnight stays.

Henderson's testimony differed greatly from R.W.'s. He testified that R.W. did not live alone and that he had seen R.W.'s husband and another woman at R.W.'s property. Henderson said that C.M. was not harassing R.W. and it was actually R.W. who was engaging in the harassing activity. He accused R.W. and others associated with her (he did not specify who) of provoking quarrels and provided several examples. Henderson said that these people used flashlights to blind drivers on the road, they "slandered quite a bit online through social media" and made "aggressive" posts on Facebook, and they "encouraged action to be taken through town members." Additionally, he said that "they've come over across the property line trying to . . . instigate a fight" and that they had called law enforcement or the fire department on occasions Henderson thought were unnecessary. Henderson had been present when law enforcement visited the R.W. and C.M. properties, and C.M. was never arrested.

Henderson helped C.M. erect tarps on his property as a makeshift fence. According to Henderson, they did this because R.W. had set up cameras monitoring C.M.'s property, and C.M. wanted some privacy. Henderson explained that they used shooting blinds as tarps because that was what C.M. had available.

Henderson's account of C.M.'s nightly activities also differed from R.W.'s. He said that C.M. had two German Shepherds that he was "constantly taking to the restroom and getting exercise." Henderson usually accompanied C.M. on the walks. He said the timing of the walks "depend[ed] [on] when the dogs have to use the restroom." Henderson did not go out on the walks on an hourly basis.

On the walks, Henderson said the dogs seldom barked. They would traverse the entire property, but C.M. tried to avoid walking the dogs by Pie's stable. He denied that either he or C.M. ever harassed Pie. Occasionally C.M. would bring a flashlight while walking his dog to look out for copperhead snakes but not to harass Pie. Henderson and C.M. would sometimes talk on these walks but only at a conversational tone.

R.W. returned to the stand after Henderson testified. She testified again that she lived alone. In explaining why there were sometimes other cars in her driveway, R.W. said that her husband would park his car in her driveway even though she objected and they were undergoing a divorce. In response to the testimony that a woman was living at her house, R.W. testified that it could have been someone she hired to help sell some of her personal property, though that woman had only visited the house three or four times.

R.W. also denied ever trespassing on the Roberts' property. She also explained that her belief one of the Roberts children was hit by a stray bullet was because she read on social media something about one of the children being injured. Regarding her allegation that bullets hit Wood's outbuilding, R.W. said it was her "understanding from talking [to] a couple of other neighbors" that Wood put up a fence in response to bullets hitting his chicken coop.

C.M. did not testify.

The district court ruled from the bench after the hearing and denied R.W.'s request for a protection order, finding that R.W. did not meet her burden of proof. With regard to the April 28, 2020 allegations, the district court noted that R.W. never saw C.M. throw anything at Pie or direct anyone else to throw something. The testimony that Pie was injured was "simply just not enough." There was not direct testimony or evidence that the projectiles came from C.M. Finally, the court said most of the other evidence that the court heard, including C.M. walking his dogs along the property line and using shooting blinds as a fence, was "constitutionally protected activity." The court found that even if these activities caused R.W. fear, the acts were not directed toward R.W. with the intent to cause her fear.

R.W. appealed.

11

1. *Are the district court's rulings on temporary orders in this case rendered moot by the court's final order?*

R.W.'s first two arguments pertain to the district court's ruling on temporary protection orders. The statute governing temporary protection orders is K.S.A. 2020 Supp. 60-31a05. It provides:

> "(a) Within 21 days of the filing of a petition under the protection from stalking, sexual assault or human trafficking act a hearing shall be held at which the plaintiff must prove the allegation of stalking, sexual assault or human trafficking by a preponderance of the evidence and the defendant shall have an opportunity to present evidence on the defendant's behalf. Upon the filing of the petition, the court shall set the case for hearing. At the hearing, the court shall advise the parties of the right to be represented by counsel.
>
> "(b) Prior to the hearing on the petition and upon a finding of good cause shown, the court on motion of a party may enter such temporary relief orders in accordance with K.S.A. 60-31a06, and amendments thereto, or any combination thereof, as it deems necessary to protect the victim from being stalked, sexually assaulted or trafficked. Temporary orders may be granted ex parte on presentation of a verified petition by the victim supporting a prima facie case of stalking, sexual assault or human trafficking.
>
> "(c) If a hearing under subsection (a) is continued, the court may make or extend such temporary orders under subsection (b) as it deems necessary." K.S.A. 2020 Supp. 60-31a05.

R.W. first argues that the district court erred in not granting an ex parte temporary protection order based on the facts alleged in her verified petition. Second, she argues that the district court erred when it held that the Act did not authorize it to entertain successive requests for temporary protection orders based on conduct that occurred after the filing of the original petition. C.M. asserts that any issues regarding R.W.'s requests for a temporary protection order were rendered moot by the district court's final order.

12

This court exercises unlimited review over the issue of whether an issue is moot. *In re A.E.S.*, 48 Kan. App. 2d 761, 764, 298 P.3d 386 (2013).

"A case is moot when a justiciable controversy no longer exists. 'A justiciable controversy has definite and concrete issues between the parties and "adverse legal interests that are immediate, real, and amenable to conclusive relief."' [Citations omitted.]" 48 Kan. App. 2d at 764. Kansas courts generally do not decide moot questions or render advisory opinions. 48 Kan. App. 2d at 764.

Under K.S.A. 2020 Supp. 60-31a05(b), the district court can issue temporary relief orders "[p]rior to the hearing on the petition." Once the district court conducts the hearing on the petition, any temporary orders are no longer effective. Because the district court has conducted a hearing on the petition and entered a final order, any issues pertaining to the district court's failure to issue temporary orders are now moot.

The inquiry does not end here. The mootness doctrine is not jurisdictional, so it is subject to exceptions. Under one of these exceptions, an appellate court will review a moot issue if it is capable of repetition and raises concerns of public importance. "Public importance means 'something more than that the individual members of the public are interested in the decision of the appeal from motives of curiosity or because it may bear upon their individual rights or serve as a guide for their future conduct as individuals.' [Citations omitted.]" *In re A.E.S.*, 48 Kan. App. 2d at 766.

This court examined this exception in *In re A.E.S.*, a case in which a parent, M.S., appealed from a temporary custody order in a child in need of care proceeding. The district court entered orders of adjudication and disposition while the appeal was pending. This court held that M.S.'s appeal of the temporary custody order was rendered moot by the district court's adjudication and disposition orders. 48 Kan. App. 2d at 764. It

13

declined to consider M.S.'s arguments on the sufficiency of the evidence under an exception to the mootness doctrine because the order of disposition concluded the evidentiary issues. "Any further consideration of such issues," the court stated, "would be case specific and would not implicate any exception to the mootness doctrine. Such consideration would simply result in an advisory opinion which we decline to render." 48 Kan. App. 2d at 766. The court did, however, agree to consider M.S.'s constitutional challenge to the statute governing the temporary orders procedure because "the constitutionality of the temporary order statute is a matter of public importance." 48 Kan. App. 2d at 767.

R.W.'s first argument, that the district court erred in not granting an ex parte temporary protection order based on the facts alleged in her verified petition, is moot for the same reasons that M.S.'s challenge to the sufficiency of the evidence was moot in *In re A.E.S.* The question of whether the facts in R.W.'s petition established a prima facie case of stalking would require consideration of the specific facts of the case. The question would not involve matters of public importance—only matters affecting the parties in this case.

R.W.'s second argument, however, does fall under an exception to the mootness doctrine. The district court held that there was "no legal precedent to justify the issuance of a Temporary Order of Protection once an initial request has been denied." R.W. asserts that the district court can entertain successive requests for temporary protection orders based on facts arising after the filing of the original petition.

Resolution of this issue requires interpreting K.S.A. 2020 Supp. 60-31a05. Such a statutory analysis can be completed without reference to the specific facts of the case, unlike the factual analysis that would be necessary to resolve R.W.'s first argument on temporary orders. Further, this issue is one that is capable of repetition, yet evading review. *Smith v. Martens*, 279 Kan. 242, Syl. ¶ 2, 106 P.3d 28 (2005) (court electing to

14

entertain a constitutional issue in a PFS case because, although moot, was an issue of public importance capable of repetition).

With certain exceptions, a party cannot appeal a district court's decision on temporary orders. See K.S.A. 2020 Supp. 38-2273(a) (allowing parties in a child in need of care case to appeal a district court's temporary custody order). Usually, the party must wait until the final order to file an appeal. See K.S.A. 2020 Supp. 60-2102 (establishing appellate jurisdiction in civil cases). Even if the plaintiff could appeal the denial of temporary orders, by the time the case reached this court the district court likely would have already conducted the final hearing. See K.S.A. 2020 Supp. 60-31a05(a) (providing that district court must conduct hearing on petition for protection from stalking within 21 days of filing unless a continuance is granted). In cases dealing with stalking, which by definition requires a "course of conduct," it is reasonable to expect that in some cases the conduct will continue even after the petition is filed. See K.S.A. 2020 Supp. 60-31a02(d) (defining "stalking"). As such, this is not an unusual or peculiar situation unique to the facts of this case. For these reasons, consideration of R.W.'s second argument on temporary orders falls under an exception to the mootness doctrine.

2. *Did the district court err when it held that it could not reconsider granting temporary protection from stalking orders based on new facts?*

R.W. asked the district court to reconsider its decision not to issue temporary orders based on facts that developed after she filed her petition. These facts were set forth in a verified motion. In her motion, R.W. asked the district court to grant the temporary orders ex parte based upon the additional facts in the motion. Alternatively, she asked the district court for an evidentiary hearing on the issue of temporary orders if it did not issue the temporary orders ex parte.

15

Resolution of this issue requires interpretation of K.S.A. 2020 Supp. 60-31a05(b). Statutory interpretation presents a question of law over which appellate courts have unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. 309 Kan. at 149-150. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. 309 Kan. at 149-50. When construing statutes to determine legislative intent, appellate courts must consider various provisions of an act *in pari materia* with a view of reconciling and bringing the provisions into workable harmony if possible. The courts must construe statutes to avoid unreasonable or absurd results and presume the Legislature does not intend to enact meaningless legislation. *Friends of Bethany Place, Inc. v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013).

Whether a district court is permitted to entertain successive requests for temporary orders based on new facts in protection from stalking proceedings is an issue that does not appear to have been directly addressed by Kansas appellate courts. As stated above, the operative language of the statute is:

> "(b) Prior to the hearing on the petition and upon a finding of good cause shown, the court on motion of a party may enter such temporary relief orders in accordance with K.S.A. 60-31a06, and amendments thereto, or any combination thereof, as it deems necessary to protect the victim from being stalked, sexually assaulted or trafficked.

16

Temporary orders may be granted ex parte on presentation of a verified petition by the victim supporting a prima facie case of stalking, sexual assault or human trafficking." K.S.A. 2020 Supp. 60-31a05.

An interpretation of K.S.A. 2020 Supp. 60-31a05(b) begins with a determination as to how broadly the Protection from Stalking Act is to be construed. When the Legislature dictates that an act is to be liberally construed, the language of the law is broadly interpreted for the purpose of upholding and promoting its object and its provisions "should not receive a strained and technical interpretation for the purpose of defeating its manifest purposes." *Kansas Wheat Growers Ass'n v. Schulte*, 113 Kan. 672, 684, 216 P.311 (1923). Conversely, when a statute is to be strictly construed, the court applies a narrow reading of the statute. For example, in *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018), the Kansas Supreme Court stated that Kansas adoption statutes are "strictly construed in favor of maintaining the natural parents' rights when it is claimed consent to adoption is not required by reason of a parent's failure to fulfill statutory parental obligations."

Kansas law has dictated that the Protection from Stalking Act is "to be liberally construed to protect victims of stalking and to facilitate access to judicial protection for those victims." *Dester v. Dester*, 50 Kan. App. 2d 914, Syl. ¶ 1, 335 P.3d 119 (2014) (citing K.S.A. 60-31a01 et seq.). The language of the statute should thereby receive a board interpretation in favor of protecting victims of stalking and facilitating victims' access to judicial protection.

Under the Act, temporary orders are deemed so important that the district court is authorized to issue them ex parte when warranted by the circumstances. K.S.A. 2020 Supp. 60-31a05(b). K.S.A. 2020 Supp. 60-31a05(b), moreover, specifically states that the court on a party's motion may enter such temporary relief orders "*as it deems necessary*

17

*to protect the victim from being stalked, sexually assaulted or trafficked*." (Emphasis added). K.S.A. 2020 Supp. 60-31a05(b).

Under K.S.A. 2020 Supp. 60-31a05(b), ex parte temporary orders are authorized upon presentation of a verified petition. Thus, if a party wants the district court to issue ex parte temporary orders based on new facts, the facts would need to be added to an amended verified petition. The statute does not permit temporary orders to be granted ex parte based on new facts pled in a motion—it is specific that temporary orders can only be granted ex parte if the petition establishes a prima facie case of stalking.

Consistent with the construction of the Protection from Stalking Act, the statute does not limit the district court in granting temporary orders ex parte. Nor does it limit the district court to granting temporary orders based solely on the facts in a verified petition. Rather, the statute authorizes the district court to grant temporary orders "on motion of a party" any time "[p]rior to the hearing on the petition and upon a finding of good cause shown." K.S.A. 2020 Supp. 60-31a05(b). Additionally, both parties agree that the district court has the discretion to issue temporary orders based on facts arising after the petition is filed.

As shown in this case, situations may conceivably arise where the court should exercise its discretion and consider a party's successive request for temporary orders when "it is necessary to protect the victim from being stalked, sexually assaulted or trafficked." K.S.A. 2020 Supp. 60-31a05(b). Problematically, if the court was not able to consider a party's successive request, it is possible the moving party would be unprotected and unable to receive judicial protection *until* the court conducts a hearing on the PFS request. Not surprisingly, K.S.A. 2020 Supp. 60-31a05 does not specifically forbid successive requests for temporary orders. Compare with K.S.A. 2020 Supp. 60-1507(c)(statute generally limits successive motions).

18

Here, the district court said it did "not believe procedurally that there is a . . . scheme for a reconsideration with new facts on [a] request for a reconsideration of the denial of Temporary Orders." The district court unduly limited its discretionary powers under K.S.A. 2020 Supp. 60-31a05(b). This interpretation is inconsistent with the construction and purpose of the Protection from Stalking Act, which is to protect victims of stalking and to facilitate access to judicial protection for those victims.

Further, when the district court denied R.W.'s request for reconsideration, it did so in part because "[p]art of the . . . statutory intent is that these matters be heard expeditiously," which is why the plaintiff has a right to a final hearing within 21 days of filing the petition. It is true, as the district court said, that matters should be heard expeditiously. In this case, R.W. had the right to a final hearing within 21 days of filing her petition, or May 26, 2020. K.S.A. 2020 Supp. 60-31a05. There is nothing in the record that indicates why the district court did not conduct the hearing by that date, but on June 9, 2020, R.W. moved for a continuance of the trial so that she could conduct discovery. It was not until June 22, 2020, that R.W. asked the court to reconsider its denial of the temporary orders. The court could have considered these matters in exercising its discretion and deciding whether R.W. had shown good cause for granting temporary orders.

To summarize, the district court should have broadly construed K.S.A. 2020 Supp. 60-31a05 and found that it could have considered a successive request for temporary orders. While the court did not hear a successive request, the court did later conduct a hearing on the PFS request. Thus, although the district court erred by failing to recognize that it had the discretion to grant R.W.'s request at all, this error does not require reversal. The court's error was harmless as a later hearing was conducted.

19

3. *Did the district court err in denying R.W.'s requests to sequester the witnesses?*

R.W. next argues that the district court erred when it held that it could not sequester witnesses in civil trials. Here, it should be noted that the district court did not hold that sequestration is prohibited in all civil trials. The court suggested that it did sequester witnesses in some instances when children or a domestic relationship is involved. The district court's ruling focused on its authority to sequester witnesses in protection order proceedings. Thus, the focus of this inquiry should be on sequestration of witnesses in protection order proceedings.

Interpretation of the Kansas Code of Civil Procedure in determining whether Kansas law permits sequestration of witnesses in protection order proceedings is a question of law subject to unlimited review. *White v. Shipman*, 54 Kan. App. 2d 84, 88-89, 396 P.3d 1250 (2017) (interpreting Kansas Code of Civil Procedure in determining whether discovery rules are applicable to K.S.A. 60-1501 proceedings).

Nothing in Kansas law authorizes or prohibits sequestration of witnesses in a civil trial. The Kansas Code of Civil Procedure provides that "[w]hen no provision in this article refers specifically to a matter over which the court has jurisdiction, the court must proceed in a just and equitable manner that protects the rights and interests of all affected parties." K.S.A. 2020 Supp. 60-265(c). Additionally, the Kansas Supreme Court has emphasized that "district courts of this state have broad discretion and powers, independent of the statutory code, to take actions to see that justice is done in a particular case even though there is no specific provision granting such authority in the code of civil procedure." *Daniels v. Chaffee*, 230 Kan. 32, 38, 630 P.2d 1090 (1981). Accordingly, the matter of whether to sequester witnesses in civil trials, including PFS proceedings, falls within the district court's broad discretion.

The next question is whether the district court abused its discretion in denying R.W.'s repeated requests for sequestration. C.M. asserts that, by "reasoning . . . that Kansas law did not provide for the sequestration of witnesses in a civil matter, and that the courtroom was an open courtroom . . . the Court utilized its discretion to deny Plaintiff's request."

A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). Although the abuse of discretion standard is highly deferential, "even under the deferential abuse of discretion standard of review, an appellate court has unlimited review of legal conclusions upon which a district court's discretionary decision is based. A district court by definition abuses its discretion when it makes an error of law." *State v. Ernesti*, 291 Kan. 54, Syl. ¶ 10, 239 P.3d 40 (2010); see also *State v. Schaefer*, 305 Kan. 581, 587, 385 P.3d 918 (2016) ("[T]he district court's decision must have been based on a correct understanding of the law to receive the full deference of that review standard."). In this sense, the abuse of discretion standard of review includes a component of unlimited review.

In this case, the district court made an error of law and thus abused its discretion when it held that Kansas law does not permit witness sequestration in protection order cases. The power to sequester witnesses falls within the broad discretion of the district court. It is also "an abuse of discretion to refuse to exercise discretion or fail to appreciate the existence of the discretion to be exercised in the first place." *State v. Horton*, 292 Kan. 437, 440, 254 P.3d 1264 (2011).

Just because a district court abuses its discretion does not mean it commits reversible error. An error will be deemed harmless where it does not "affect any party's substantial rights." K.S.A. 2020 Supp. 60-261. This requires the party benefiting from the error to persuade the court that there is no reasonable probability that the error affected

the trial's outcome in light of the entire record. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012). C.M. successfully does that here.

Analysis of this issue is made somewhat difficult because R.W. does not specify which witnesses heard which testimony. From the record, it can be ascertained that Roberts heard R.W.'s testimony. However, whether other witnesses were present on the first day of trial is unknown. The second day of trial was conducted on Zoom, and the Zoom witnesses did not hear each other testify. Henderson was in the courtroom on the second day of trial, but it is not clear from the record whether he was in the courtroom during any Zoom testimony.

The sequestration of witnesses is a centuries-old practice. "Its aim is to exercise a restraint on witnesses tailoring their testimony to that of earlier witnesses and aids in detecting testimony that is less than candid." *State v. Heath*, 264 Kan. 557, 589, 957 P.2d 449 (1998) (citing *Geders v. United States*, 425 U.S. 80, 87, 96 S. Ct. 1330, 47 L. Ed. 2d 592 [1976]). As C.M. notes in his brief, the record here gives no indication that Roberts' testimony was tailored to R.W.'s or that sequestering her would have resulted in more candid testimony. Roberts' testimony spans only 18 pages, and many of those pages were objections and arguments from counsel. Much of the testimony dealt with matters not covered by R.W.'s testimony. Accordingly, the district court's error does not require reversal.

4. *Did the district court err by dismissing R.W.'s petition after finding that she failed to meet her burden of proof?*

R.W.'s final argument is that the district court erred in finding that she did not present sufficient evidence to justify issuing a protection from stalking order.

The Act requires a plaintiff to prove his or her allegation of stalking by a preponderance of the evidence. K.S.A. 2020 Supp. 60-31a05(a). "Stalking" and related terms "harassment" and "course of conduct" are defined in K.S.A. 2020 Supp. 60-31a02(d). Taken together,

"a valid stalking claim (not involving the use of an aerial drone) would require proof of:

- At least two separate acts;
- Directed at a specific person;
- Intentionally done;
- Showing a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress;
- Placing the person in reasonable fear for his or her safety;
- Through conduct that seriously alarmed, annoyed, tormented, or terrorized the person; and
- That served no legitimate purpose and was not constitutionally protected." *C.M. v. McKee*, 54 Kan. App. 2d 318, 322, 398 P.3d 228 (2017) (citing K.S.A. 2016 Supp. 60-31a05[a]).

R.W. asks this court to employ unlimited review of the district court's decision. C.M. says the proper review is for sufficiency of the evidence. However, it is significant that the district court made a negative finding—that R.W. failed to sustain her burden of proof. When the district court makes a negative finding, appellate review is as follows:

"The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice, the finding of the trial judge cannot be disturbed." *Cresto v. Cresto*, 302 Kan. 820, Syl. ¶ 7, 358 P.3d 831 (2015).

"We do not reweigh the evidence or make our own credibility determinations, and we generally view the evidence in the light most favorable to the party who prevailed in the district court." *Kerry G. v. Stacy C.*, 53 Kan. App. 2d 218, 221-22, 386 P.3d 921 (2016).

In her brief, R.W. cites the relevant statutes, recites the allegations in her petition, summarizes her testimony, and reviews the district court's decision. R.W. then states, without analysis, that "[h]er proof, as alleged and required in order for the Court to grant a Permanent Order of Protection, by a preponderance of the evidence was satisfied and largely uncontroverted. The District court erred in denying her petition."

R.W.'s failure to apply the correct standard of review and analyze the issue under that standard of review makes it difficult to review her argument. R.W. does not specify what evidence was uncontested or why her evidence satisfied each element of stalking as defined in K.S.A. 2020 Supp. 60-31a02. And she provides no explanation as to why the district court's disregard of any uncontroverted evidence was arbitrary or based on some extrinsic consideration.

A review of the record, however, shows that there was little undisputed evidence. R.W. contended that she lived alone, whereas Roberts, Wood, and Henderson all observed multiple people who appeared to be living with her. R.W. said one of the Roberts children was hit by a stray bullet, but Roberts said that was not the case. Similarly, R.W. alleged that C.M. shot Wood's outbuilding, but Wood denied it. Roberts testified that R.W. told her all of the allegations in the petition were perjured.

There was also a great discrepancy in the descriptions of C.M.'s nightly walks. R.W. testified that C.M., often accompanied by Henderson, conducted hourly patrols during which he would shine flashlights and lasers in Pie's face. Scott also testified that he saw C.M. shining lights on Pie. Both also said they saw projectiles going toward Pie from the direction of C.M.'s property. Scott added that C.M. would stop by Pie's stable

24

and let his dog bark aggressively for several minutes. But, according to Henderson, C.M. was just walking his dogs around his property and C.M. tried to avoid going near Pie. Henderson denied that C.M. ever used lights or his dogs to harass Pie.

This court has previously noted:

"[I]t is very difficult for this court to make a factual determination in a case of this nature. We understand that people's lives and well-being are concerned and that the trial court is the best judge as to whether there has been abuse sufficient to require an order of the type entered in this case. The trial court is the sole arbitrator as to the credibility of the witnesses and must determine which witness it believes." *Trolinger*, 30 Kan. App. 2d at 197.

In this case, the district court considered the facts and the credibility of witnesses. This court "cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." *Cresto*, 302 Kan. 820, Syl. ¶ 7. Additionally, "the trial court is presumed on appeal to have found all facts necessary to support its judgment." *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 741, 159 P.3d 1035 (2007). Accordingly, the district court's decisions as to the controverted evidence should not be disturbed.

Some of the evidence was uncontroverted. The evidence regarding Pie's injuries provided by R.W. and Scott was concerning, and no one denied that Pie had injuries. R.W. submitted a photo into evidence, depicting a gash in Pie's flank, which she said she took after observing a projectile coming from the direction of C.M.'s property on the night of April 28, 2020. R.W. also testified that on the night of April 29, 2020, she heard things hitting her house after hearing C.M. outside. The district court, however, was not compelled to accept R.W.'s conclusion that C.M. threw the items on both occasions or that he did so with the intent of placing R.W. in reasonable fear for her safety. It was

25

within the district court's sole discretion to determine the weight to afford R.W.'s evidence. *Trolinger*, 30 Kan. App. 2d at 197.

The district court found that R.W. did not meet her burden of proof. The district court's negative finding should not be disturbed because the court did not arbitrarily disregard undisputed evidence. Nor is there any indication that the court relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. Based on the evidence presented and this court's standard of review, this court finds that the district court did not err in dismissing R.W.'s petition.

Affirmed.