NOT DESIGNATED FOR PUBLICATION

No. 127,764

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

B.K.,
*Appellant*,

v.

A.P.,
*Appellee*.


MEMORANDUM OPINION

Appeal from Johnson District Court; JOHN B. MCENTEE, magistrate judge. Submitted without oral argument. Opinion filed January 31, 2025. Affirmed.


*B.K.*, appellant pro se.


*Robert J. Luder* and *Lesley Renfro Willson*, of Luder & Weist, LLC, of Overland Park, for appellee.


Before BRUNS, P.J., SCHROEDER and CLINE, JJ.


PER CURIAM: B.K. appeals from the district court's denial of her petition for a protection from stalking (PFS) order against A.P. After an evidentiary hearing, the district court determined that B.K. failed to meet her burden of proof and denied her petition. Although B.K. makes several arguments on appeal, the only issue properly before us is whether the district court erred in denying her PFS petition based on the evidence presented at the hearing. Based on our review of the record on appeal, we find the district court did not err in concluding that B.K. failed to meet her burden of proof. Thus, we affirm.

1

FACTS

Many of the factual contentions made by B.K. in her brief are found only in her PFS petition. Unfortunately, she failed to provide evidence to support many of these allegations at the evidentiary hearing. Accordingly, this opinion will focus on the evidence actually presented to the district court.

Both B.K. and A.P. own homes in the Milburn Fields neighborhood in Overland Park. At all times material to this appeal, A.P. served as the president of the homeowners' association. After a dispute arose between the parties over the placement of trash cans in 2022, A.P. evidently blocked B.K. from participating in the homeowners' association's Facebook page. Since that time, B.K. alleges that A.P. has been stalking and harassing her.

On March 19, 2024, B.K. filed a PFS petition against A.P. In her petition, B.K. made multiple allegations against A.P. The district court did not issue a temporary PFS but instead scheduled an evidentiary hearing. At the hearing held on May 7, 2024, both parties appeared pro se.

B.K. and A.P. were the only witnesses who testified at the hearing. In addition, each party submitted seven exhibits into evidence. At the hearing, B.K. testified that the basis for her PFS petition was that A.P. had been "harassing and stalking" her in the neighborhood for the past two years. According to B.K., her initial contact with A.P. was in his capacity as the homeowners' association president in an attempt to address issues regarding an ongoing road and sidewalk construction project.

B.K. testified that the relationship between the parties "went sour when [A.P.] reached out about my trash can placement." B.K. explained that people were mistaking her house for an Airbnb—which was actually located across the street from her

residence—and so she placed her trash can in the middle of her driveway to signal that her residence was not the rental property. She also testified that she spoke with the Overland Park Code Compliance Department and the Police Department before taking this action.

Further, B.K. testified that A.P. emailed her on August 15, 2022, indicating that she needed to move her trash can from the center of her two-lane driveway. She asserted that A.P. acknowledged that there were no codes or bylaws restricting her from placing the trash can in the middle of her driveway. In addition, B.K. provided the district court with a conversation that she had with A.P. on Facebook regarding the trash can, and part of the conversation was read into the record.

According to B.K., within hours after she told A.P. that she would not move her trash can, he blocked her from the homeowners' association's Facebook page. B.K. alleged that this action stopped her from communicating with other members of the homeowners' association. B.K. further alleged that being blocked from the Facebook group "put me in concern for my safety." B.K. also testified that a few days later a man came to her house in the middle of the night and banged on her doors as well as the garage before circling the house as if he was "trying to break in."

Additionally, B.K. testified that after A.P. learned she was reaching out to neighbors for support, he yelled at her about how she was ruining his reputation. B.K. alleged that since that time, A.P. had driven past her house many times, and had flipped her off on several occasions. One of her exhibits depicted a person she said was A.P. making "lewd gestures . . . out his window." In addition, B.K. submitted a photo showing A.P. taking a photo of her house. Likewise, B.K. testified that A.P. often glares at her or "makes nasty faces" as he drives by her house. Moreover, B.K. testified that A.P. flipped her off at a homeowners' association meeting held on August 22, 2023.

3

Further, B.K. testified regarding an incident that allegedly occurred in July 2023 when she was walking door-to-door in the neighborhood asking neighbors "to sign a petition and remove [A.P.] from office as HOA president for inappropriate behavior." According to B.K., A.P. ran across the street and yelled: "'Yes, she doesn't have the support she thinks she does. Yeah, she made it all up.'" B.K. also alleged that A.P. began chasing her "with his mower running" and screaming: "'Are you coming to the HOA meeting? Huh? Everyone's invited, even you.'" B.K. claimed that after she continued walking away, A.P. approached her in his vehicle to flip her off.

In addition, B.K. testified that in March 2024, A.P. approached her at the intersection of Metcalf and 72nd Terrace, cutting her car off and screaming for her to "'Go away.'" B.K. further testified that A.P. "aided and abetted" another individual who came to her house in the middle of the night and threw poison on her lawn. Yet she did not explain to the district court how A.P. was involved in the incident other than the person was "connected to the HOA board as a volunteer."

B.K. testified that she is in fear of A.P. and that she no longer feels safe to walk in her neighborhood. She testified that she carries a loaded gun with her at all times both inside and outside her residence. Additionally, B.K. testified that she installed reinforced entry doors, a GPS tracking system, and over 20 home security cameras due to her fear of A.P.

In his defense, A.P. testified that the PFS petition that is the subject of this appeal is "largely a duplication" of a prior PFS petition that B.K. had filed and that had been dismissed in February 2023. A.P. also testified that B.K. filed a similar claim against him with the Kansas Human Rights Commission, which had been dismissed for lack of probable cause in December 2023. A.P. then testified about the history of the relationship between the parties.

4

A.P. testified that he tried to be cordial to B.K. According to A.P., his first contact with B.K. was several years ago when she made complaints about barking dogs and people walking their dogs through her yard. Evidently, B.K. was told that it was not the homeowners' association's responsibility to address those concerns. According to A.P., the homeowners' association president at the time blocked B.K. from the neighborhood Facebook group.

Furthermore, A.P. testified that because B.K. lived near the entrance of the neighborhood, he often drove by her house to take a child to daycare and to go to work. He denied B.K.'s allegations that he was being investigated for aiding and abetting the vandalization of her lawn, and that he had no connection to the person. A.P. also testified that he did not flip off B.K. at the homeowners' association meeting. Instead, he explained that he was reenacting what he saw another neighbor do at the meeting.

Moreover, A.P. testified that B.K. had continued to attend every homeowners' association board meeting up to the time of the hearing. He indicated that at the February 2024 meeting—which was held just weeks before the petition was filed—B.K. had sat down directly next to him. Ultimately, although A.P. admitted that he and B.K. had had disagreements, he denied doing anything that warranted the granting of a PFS order.

At the conclusion of the hearing, the district court denied B.K.'s petition for a PFS order. In doing so, the district court found that B.K. had failed to meet her burden of proof. The district court recognized there was "bad blood" between the parties, but it found that it "goes both ways." Significantly, the district court found that both parties had credibility issues based on their testimony.

Specifically, the district court found:

5

- B.K. lived on the corner of the street, and it was likely that A.P. had to travel by her home on a daily basis.

- A couple of the exhibits showed A.P. flipping off B.K. from the public roadway.

- Although "rude and insulting," A.P. had a right to make such gestures and they were not sufficient to cause a reasonable person to fear for his or her safety or to suffer substantial emotional harm.

- A.P.'s testimony was credible as to why he was making the "flipping off" gesture at the homeowners' association meeting.

- The facts were reasonably disputed as to whether A.P. chased B.K. with a lawnmower or that he cut her off in traffic.

- B.K. submitted no evidence that A.P. directed anyone to commit an alleged felony on her property.

- There was no evidence that A.P. was the man who came to the outside of B.K.'s home to bang on the doors and the garage.

- B.K. did not present sufficient evidence to show that A.P. had committed two or more instances that would cause a reasonable person to fear for their safety and to suffer substantial emotional distress.

Thereafter, B.K. timely filed a notice of appeal.

ANALYSIS

The primary issue presented here is whether the district court erred in denying B.K.'s petition for a PFS order following an evidentiary hearing. Essentially, B.K. contends that the district court erred in ruling she failed to meet her burden of proof. In response, A.P. first contends that B.K.'s brief failed to comply with Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36) in various ways. He also contends that the district

6

court properly weighed the evidence and made a reasonable decision in denying B.K.'s petition for a PFS order.

As A.P. correctly points out, there are several technical violations of Rule 6.02(a)(5) in B.K.'s brief. Even so, we find that she substantially complied with the rule in order to allow for meaningful review by our court. Accordingly, we find that it is appropriate for us to decide this appeal on the merits.

The Protection from Stalking Act, K.S.A. 2023 Supp. 60-31a01 et seq., is "to be liberally construed to protect victims of stalking and to facilitate access to judicial protection for those victims," and as a result, we are to interpret the language broadly in favor of protecting victims of stalking. See *Dester v. Dester*, 50 Kan. App. 2d 914, Syl. ¶ 1, 335 P.3d 119 (2014); see also *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 76, 159 P.3d 1035 (2007). Still, the Act requires a petitioner to prove his or her allegations of stalking by a preponderance of the evidence. K.S.A. 2023 Supp. 60-31a05(a).

This court has found that a petitioner seeking a PFS order must show: (1) at least two separate acts; (2) directed at a specific person; (3) intentionally done; (4) showing a continuity of purpose that would cause a reasonable person to suffer substantial emotional distress; (5) placing the person in reasonable fear for his or her safety; (6) through conduct that seriously alarmed, annoyed, tormented, or terrorized the person; and (7) that served no legitimate purpose and was not constitutionally protected. *C.M. v. McKee*, 54 Kan. App. 2d 318, 322, 398 P.3d 228 (2017).

Under the Act, "[s]talking" is defined as "an intentional harassment of another person that places the other person in reasonable fear for that person's safety." K.S.A. 2023 Supp. 60-31a02(d). "Harassment" means a "knowing and intentional course of conduct directed at a specific person that seriously alarms, annoys, torments or terrorizes the person, and that serves no legitimate purpose." K.S.A. 2023 Supp. 60-31a02(d)(1).

7

The Act sets forth that "[c]ourse of conduct" means conduct "consisting of two or more separate acts over a period of time, however short, evidencing a continuity of purpose which would cause a reasonable person to suffer substantial emotional distress. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" K.S.A. 2023 Supp. 60-31a02(d)(2).

In this case, the district court heard the testimony of the parties and considered the evidence presented at the evidentiary hearing. On appeal, we are not to "reweigh the evidence or make our own credibility determinations, and we generally view the evidence in the light most favorable to the party who prevailed in the district court.' [Citations omitted.]" *Kerry G. v. Stacy C.*, 53 Kan. App. 2d 218, 221-22, 386 P.3d 921 (2016). In other words, we are not to replace our judgment for that of the district court so long as it was supported by the evidence as viewed in the light most favorable to A.P. as the prevailing party.

Although B.K. argues that A.P. admitted to the allegations she made against him, a review of the record reveals otherwise. In his testimony, A.P. expressly denied doing many of the acts alleged by B.K.—such as chasing her with a lawn mower, cutting her off in traffic, and aiding and abetting an individual in destroying her lawn—and she provided no evidence to corroborate her testimony regarding those allegations. The district court questioned both parties' credibility. As an appellate court, we "cannot nullify a trial judge's disbelief of evidence nor can [we] determine the persuasiveness of evidence which the trial judge may have believed." *Cresto v. Cresto*, 302 Kan. 820, Syl. ¶ 7, 358 P.3d 831 (2015); see also *Trolinger v. Trolinger*, 30 Kan. App. 2d 192, 197, 42 P.3d 157 (2001).

As the district court ruled, the record includes a couple of blurry photos purporting to show A.P. flipping B.K. off while driving by her house. The record also contains a photo of A.P. with his middle fingers extended during a homeowners' association

meeting. The district court found A.P.'s testimony to be credible regarding the reason he had made this gesture at the homeowners' association meeting. In addition, the district court found that A.P.'s behavior did not rise to the level of meeting the required elements of causing a reasonable person to suffer substantial emotional distress or placing the person in reasonable fear for his or her safety. See K.S.A. 2023 Supp. 60-31a02. Furthermore, the district court found that A.P. had a legitimate purpose for driving by B.K.'s house on his way in and out of the neighborhood as well as for being present within his own neighborhood. See *C.M.*, 54 Kan. App. 2d at 322.

In summary, B.K. is essentially asking this court to reweigh the evidence, which we are not to do. See *Kerry G.*, 53 Kan. App. 2d at 221-22. Again, we note the credibility of witnesses is a determination to be made by the district court. *Cresto*, 302 Kan. 820, Syl. ¶ 7, (citing *Dester*, 50 Kan. App. 2d 914, Syl. ¶ 1). Even though the Act is to be liberally construed to protect victims of stalking, the district court is not obliged to find one party to be more credible than the other. Likewise, we find nothing in the record to suggest that the district court arbitrarily disregarded undisputed evidence in making its findings.

We also note that B.K. briefly argues the district court erred by "misappropriating Constitutional protection for being on public roadways." In support of her position, she cites *Frisby v. Schultz*, 487 U.S. 474, 487-88, 108 S. Ct. 2495, 101 L. Ed. 2d 420 (1988), in which the United States Supreme Court found no constitutional protection for picketers located outside a personal residence. Yet unlike the cases which she cites in her brief, none of the evidence suggests that A.P. remained outside her home or that he monitored her activities. And, as discussed above, the district court found A.P.'s testimony regarding why he drove by B.K.'s house to be credible. Finally, B.K. asserts the district court ignored her allegations that A.P. hid documents to help conceal the identity of the individual whom she claimed damaged her lawn as well as other documents. We find no evidence corroborating these incidents in the record on appeal.

CONCLUSION

In conclusion, we find that the district court did not err in denying B.K.'s petition for a PFS order following an evidentiary hearing. Although our decision may have been different had the members of this panel heard the evidence, we must yield to the district court to make determinations regarding witness credibility and the weight to be given to the evidence. Here, the record on appeal contains evidence—when viewed in the light most favorable to A.P. as the prevailing party—to support the district court's ruling. Likewise, we find nothing in the record to establish that the district court's ruling was based on bias, passion, prejudice, or other extrinsic circumstance. See *Cresto*, 302 Kan. 820, Syl. ¶ 7. We, therefore, affirm the district court's denial of the petition for a PFS order.

Affirmed.